UNITED STATES of America ex rel.
Thomas KIRBY, Petitioner-
Appellant,

v.

David R. STURGES, Chairman of the
Illinois Parole and Pardon Board (or
his successor), Respondent-Appellee.

No. 73–2057.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1974.

Decided Jan. 28, 1975.

Certiorari Denied June 9, 1975.

See 95 S.Ct. 2424.

398

Robert L. Graham, Jerold S. Solovy, Chicago, Ill., for petitioner-appellant.

William J. Scott, Atty. Gen., Jayne A. Carr, Asst. Atty. Gen., Chicago, Ill., for respondent-appellee.

Before FAIRCHILD and STEVENS, Circuit Judges, and LARAMORE, Senior Judge.*

STEVENS, Circuit Judge.

Having failed, on direct review of his robbery conviction, to persuade the Supreme Court to hold that evidence of his identification at a pre-indictment showup was inadmissible because he was not represented by counsel, Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411, Kirby now presents us with two questions which the Supreme Court has not

* Senior Judge Don N. Laramore of the United States Court of Claims is sitting by designation.

yet answered. The first, expressly reserved in *Kirby,* is whether "the particularized circumstances of this case" disclose a deprivation of due process;[1] the second, identified but not expressly decided in Neil v. Biggers, 409 U.S. 188, 198–199, 93 S.Ct. 375, 34 L.Ed.2d 401, is whether identification evidence derived from a showup which (a) was conducted after June 12, 1967, the date of decision of *Wade, Gilbert* and *Stovall,*[2] and (b) was unnecessarily suggestive since a lineup could have been conducted, is, as a matter of constitutional law, inadmissible. Kirby also argues that his arrest was improper and that the district court erroneously denied his request for an evidentiary hearing.

## I.

Willie Shard was robbed at about 4:30 in the afternoon of February 20, 1968. While walking from a friend's house to a restaurant, Shard looked back and saw two men about 15 feet away. As he started up the steps to the restaurant, one of the men ran up and grabbed him around the neck while the other took seven traveler's checks, about $30 in cash, and his identification cards from Shard's pockets. Shard testified that he got a good look at the men before, during, and after the robbery.[3] The next morning he walked to the police station, reported the theft, and gave the police a description of the two robbers.

At about 11:00 a. m. on February 22, two police officers arrested Kirby and his co-defendant Bean. They had stopped Kirby because he resembled a man named Hampton, who was wanted on an unrelated charge. When the police asked Kirby and Bean for identification, they displayed traveler's checks and identification cards bearing Shard's name. In response to further questions, Kirby first stated that the checks were "play money" and then that they had won them in a crap game.[4] The conflicting and evasive answers, coupled with the possession of Shard's property, persuaded the officers to take them into custody. The officers were not aware of the robbery of Shard until after they arrived at the station.

The police then called Shard at work and arranged to bring him to the station.[5] He was asked if he had been robbed and whether he could identify the men who had robbed him. He was not told that any of his property had been recovered.

When Shard entered a large room at the police station, he saw Kirby and Bean sitting at a table with an officer and immediately identified them. They were then asked to stand and Shard was asked whether they were the robbers; he replied unequivocally that they were.

The record indicates that Shard testified at a preliminary hearing before Judge Ryan,[6] before the grand jury, and at the jury trial of Kirby and Bean. During the cross-examination of Shard, counsel for the defendants had the transcript of Shard's earlier testimony and the descriptions Shard had given to the police when he first reported the robbery. No material discrepancy was developed, and Shard expressed no uncer-

---

1. In footnote 8 of its opinion in *Kirby,* the Court stated:

    "In view of our limited grant of certiorari, we do not consider whether there might have been a deprivation of due process in the particularized circumstances of this case. That question remains open for inquiry in a federal habeas corpus proceeding." 406 U.S. at 691, 92 S.Ct. at 1883.

2. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

3. See testimony quoted in 406 U.S. at 686 n. 3, 92 S.Ct. 1877.

4. These facts were established by the testimony of the arresting officers. At trial, Bean testified that he and Kirby had found the papers in an alley nearby.

5. The officers who brought him to the station had no information about either the robbery of Shard or the arrest of Kirby and Bean.

6. Shard so stated at p. 65 of the transcript of his state court trial.

tainty about the accuracy of his identification.

The trial transcript includes the testimony of Shard, the arresting officers, the officers who were present when Shard identified the defendants, and defendant Bean. The trial exhibits include Shard's traveler's checks and identification, and the prior record of Bean which was introduced for purposes of impeachment. Kirby did not testify.[7]

In his closing argument to the jury, defense counsel emphasized the suggestive character of the identification at the police station. The trial judge gave no special instruction concerning the unreliability of eyewitness identifications in general or showups in particular. The jury found both defendants guilty.

The Illinois appellate court reversed the conviction of Bean on the ground that the mere possession of property belonging to another did not establish probable cause to arrest. It affirmed Kirby's conviction, holding that his conflicting explanations of his possession of Shard's property, coupled with that possession, justified the arrest, and that the motion to suppress had been properly denied. The court expressly ruled (1) that *Wade* and *Gilbert* were inapplicable to a pre-indictment identification,[8] (2) that the circumstances surrounding the identification were not so suggestive as to deny Kirby due process of law, and (3) that the use of the showup as an identification procedure is not unconstitutional even though there was no compelling reason for not conducting a lineup.[9]

The Illinois Supreme Court denied leave to appeal. As already noted, the United States Supreme Court, after a limited grant of certiorari, decided the *Wade-Gilbert* issue but left open the remaining questions.

The case is here on appeal from Judge Will's denial of Kirby's petition for a writ of habeas corpus. Judge Will found that the record established probable cause to arrest and that the identification procedure was not impermissible. After the district court had filed its memorandum opinion on the merits, Kirby moved for reconsideration and specifically requested an evidentiary hearing. That motion was denied.

## II.

■ We agree with the following discussion of the arrest issue in the well-reasoned opinion of the district court:

Defendant's first contention is that the trial court erred in denying his motion to suppress the physical evidence taken from him at the time of his arrest—the traveler's checks and the Social Security card bearing the name "Willie Shard." He argues that his arrest was without probable cause and therefore the physical evidence seized should have been suppressed as the product of an unlawful arrest.

Our review of the transcript of the hearing conducted by the trial court on this issue, as well as the reasoning of the Appellate Court of Illinois affirming the decision, reveals no constitutional error. The initial stop of peti-

---

**7.** Kirby, who is sometimes called "Kirby Thomas" and sometimes "Thomas Kirby," told the trial judge that he was dissatisfied with his trial counsel, apparently because he advised Kirby to take the stand. In the Illinois Appellate Court Kirby also argued that his counsel was ineffective because the evidence adduced at the hearing on the motion to suppress identification testimony was limited to establishing that counsel was not present and did not relate specifically to the claim that the due process clause was offended by the showup. The Appellate Court was satisfied that the record was adequate to decide both questions. Kirby has not pursued

the denial of effective counsel contention in his habeas corpus petition. We are satisfied that the record is adequate to present the due process issues: it is apparent that Kirby and Bean were effectively represented both at the trial and in the Illinois Appellate Court.

**8.** The Illinois Supreme Court had so held in People v. Palmer, 41 Ill.2d 571, 572, 244 N.E.2d 173, 174 (1969).

**9.** The Illinois Supreme Court had so held in People v. Blumenshine, 42 Ill.2d 508, 512, 250 N.E.2d 152, 154 (1969).

tioner was based upon the police officers' mistaken belief that petitioner was a man wanted for con games according to a police department bulletin carried in the officers' squad car and bearing a description and picture of the wanted person. The Supreme Court has held an arrest or stop based upon a reasonable mistake as to identity is lawful. Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971). Petitioner does not contend the mistake in identity was not reasonable, but rather that the particular police bulletin relied upon was too vague and overbroad in its description of the wanted man to serve as a sufficient basis for arresting him.

Petitioner's contention is unsound as the bulletin carried a *picture* of the wanted man as well as a description of his physical characteristics. Furthermore, he overlooks the fact that he was not searched or arrested on the basis of his similarity to the suspect appearing in the bulletin. The alleged similarity was the basis only for the stop and request for identification. It was while petitioner was looking for identification that the officers noticed the traveler's checks bearing the name "Willie Shard." Admittedly, the possession of property bearing someone else's name would not constitute probable cause for petitioner's arrest. But, upon questioning petitioner as to the reason for his possession of this evidence, which was in plain view of one of the officers, petitioner gave two contradictory explanations. We find ourselves in agreement with the Illinois Appellate Court that this set of circumstances constituted probable cause to arrest petitioner and subsequently take from him the Shard traveler's checks and Social Security card which was uncovered as a result of the search incident to that arrest.

### III.

In arguing that Judge Will erred in not holding an evidentiary hearing, Kirby primarily relies on the Supreme Court's footnote stating that the due process question "remains open for inquiry in a federal habeas corpus proceeding." [10] We do not believe that the Court was mandating an evidentiary hearing. In our opinion the footnote preserved the question but did not prescribe the procedures to be followed in answering it.

The standards for determining when an independent evidentiary hearing in the federal district court is necessary were set forth in Townsend v. Sain, 372 U.S. 293, 312–313, 83 S.Ct. 745, 9 L.Ed.2d 770.[11] Kirby focuses on the requirement that the material facts be adequately developed at the state court hearing. He argues that there was some dispute over the facts pertaining to the stationhouse identification and the stop and arrest.

It is settled, however, that the mere existence of a dispute in the evidence does not necessarily require that

---

10. 406 U.S. at 691 n. 8, 92 S.Ct. at 1883, 32 L.Ed.2d 411, quoted in full in footnote 1, *supra.*

11. "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." 372 U.S. at 312–313, 83 S.Ct. at 757 (footnote omitted).

The Court further elaborated the situations in which an evidentiary hearing would be required:

"We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: if (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." 373 U.S. at 313, 83 S.Ct. at 757.

an evidentiary hearing be held. The test is whether the material facts were adequately developed at a full and fair hearing before the state court. *See* Townsend v. Sain, *supra*; United States ex rel. Hartgraves v. Pate, 375 F.2d 289, 290 (7th Cir. 1967); United States ex rel. Pierce v. Cannon, 508 F.2d 197 at 205 (7th Cir. 1974). Kirby contends that an evidentiary hearing would more fully develop three sets of facts bearing on the reliability of Shard's identification: (1) Shard's opportunity to observe his assailants ·before, during, and after the robbery; (2) what Shard was told by the police on the way to the stationhouse; and (3) the certainty with which Shard identified Kirby at the showup. Our review of the record persuades us, however, that the state court hearing adequately developed these facts.

## IV.

In *Stovall* the Supreme Court held that whether the confrontation conducted in a particular case is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law. . . . depends on the totality of the circumstances surrounding it . . . ." 388 U.S. at 302, 87 S.Ct. at 1972.[12]

Three different aspects of the "totality of circumstances" have been noted in cases testing the admissibility of pretrial identification evidence. The *suggestive* aspects of the police procedures were emphasized in Palmer v. Peyton, 359 F.2d 199, 201 (4th Cir. 1966)[13] and Foster v. California, 394 U.S. 440, 442–443, 89 S.Ct. 1127, 22 L.Ed.2d 402;[14] the *justifi-*

**12.** In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, involving a pretrial photo identification, the Court phrased the test as whether the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971. The *Stovall* phraseology was subsequently repeated in Foster v. California, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402. In Neil v. Biggers, 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401, the Court referred to the *Simmons* formulation as a restatement of the *Stovall* governing test.

**13.** "The opportunity for suggestion inherent in the procedure used to secure this identification is manifest. Before listening to the voice that spoke in response to the Sheriff in the station, Mrs. Britt had been told that the police had a Negro suspect in custody. She had been shown the suspect's shirt— the shirt which she later testified was 'about the same color' as that worn by her assailant. On Wednesday evening, in accordance with customary practice, Mrs. Britt had been asked to select one of a number of persons in a lineup. It is noteworthy that on Thursday evening an entirely different course was followed. Palmer's was the only voice the complainant was permitted to hear repeat the damning words. When she was asked if she could identify the voice, the only voice that was submitted for identification, the highly suggestive atmosphere that had been generated could not have failed to affect her judgment.

"Any identification process, of course, involves danger that the percipient may be influenced by prior formed attitudes; indeed we are all too familiar with instances in which supposedly 'irrefutable' identifications were later shown to have been incorrect. Where the witness bases the identification on only part of the suspect's total personality, such as height alone, or eyes alone, or voice alone, prior suggestions will have most fertile soil in which to grow to conviction. This is especially so when the identifier is presented with no alternative choices; there is then a strong predisposition to overcome doubts and to fasten guilt upon the lone suspect." 359 F.2d at 201 (footnote omitted).

**14.** "In the first lineup arranged by the police, petitioner stood out from the other two· men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber. . . . When this did not lead to positive identification, the police permitted a one-to-one confrontation between petitioner and the witness. . . . Even after this the witness' identification of petitioner was tentative. So some days later another lineup was arranged. Petitioner was the only person in this lineup who had also participated in the first lineup. . . . This finally produced a definite identification.

"The suggestive elements in this identification procedure made it all but inevitable that David would identify petitioner whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness, 'This is the man.'" 394 U.S. at 442–443, 89 S.Ct. at 1128.

*cation* for using a suggestive procedure was the apparent basis of decision in Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199;[15] and the *reliability* of the identification was critical in Neil v. Biggers, 409 U.S. 188, 199, 201, 93 S.Ct. 375, 34 L.Ed.2d 401;[16] and Coleman v. Alabama, 399 U.S. 1, 5–6, 90 S.Ct. 1999, 26 L.Ed.2d 387.[17]

■ We have no doubt that the identification procedure used by the police in this case was inherently suggestive, and significantly so. Without question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty.[18] The psychological factors that have been so thoroughly discussed by scholars and judges create a real risk of misidentification in such circumstances.[19] On the other hand, we think it equally clear that this case does not involve the extreme overt suggestiveness present in Palmer v. Peyton, *supra,* or Foster v. California, *supra.* We start then from the premise that significant suggestion is inherent in the use of any showup and was present in Kirby's identification, but that it was not so aggravated as to compel reversal without regard to other parts of the totality of circumstances.

■ We next note that the State has offered no justification in this case for its use of a showup instead of a lineup as the identification procedure.[20] There

**15.** "However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative." 388 U.S. at 302, 87 S.Ct. at 1972. Although the brief opinion in Stovall can be read to hold that the exigency justification is sufficient no matter how unreliable and suggestive the identification may have been, the Supreme Court certainly has not expressly told us that a justification may be so strong as to make a blantantly suggestive and totally unreliable identification admissible. Indeed, as we note in the text, *infra,* it is difficult to understand how exigency can be a principled basis for accepting identification testimony which is so unreliable and prejudicial as to violate the essential demands of fairness protected by the due process clause.

**16.** "We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." 409 U.S. at 199, 93 S.Ct. at 382.
"Weighing all the factors, we find no substantial likelihood of misidentification." *Id.* at 201, 93 S.Ct. at 383.

**17.** "Indeed, the court could find on the evidence adduced at the suppression hearing that Reynolds' identifications were entirely based upon observations at the time of the assault and not at all induced by the conduct of the lineup." 399 U.S. at 5–6, 90 S.Ct. at 2001. Arguably, the holding in *Coleman* is not relevant to the issue presented by this case because *Coleman* dealt only with the admissibility of in-court identifications. Necessarily, however, if the indicia of reliability, apart from the suggestiveness of the identification, warranted a finding that the in-court identification was "not at all induced by the conduct of the lineup", 399 U.S. at 6, 90 S.Ct. at 2001, it would equally follow that the victim's identification at the lineup was reliable, notwithstanding the police suggestion. Unless that suggestion was harmless, it inevitably would taint both identifications. Logically, it seems to us that the due process objection—unlike the Sixth Amendment objection—should apply equally to the in-court identification and to testimony about a prior identification.

**18.** *See* United States v. Wade, 388 U.S. 218, 234, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

**19.** P. Wall, Eye-Witness Identification in Criminal Cases 28 (1965); Levine and Tapp, The Psychology of Criminal Identification: The Gap from *Wade* to *Kirby,* 121 U.Pa.L. Rev. 1079, 1108–1118 (1973); Smith v. Coiner, 473 F.2d 877, 880–881 (4th Cir. 1973), cert. denied, 414 U.S. 1115, 94 S.Ct. 848, 38 L.Ed.2d 743; Wright v. United States, 131 U.S.App.D.C. 279, 404 F.2d 1256, 1262 (1968) (Bazelon, C. J., dissenting).

**20.** Thus, the showup was not conducted immediately after the robbery when it might be important for the police to ascertain quickly whether they had captured the right person or whether they should continue their search while the criminal is still within easy reach. *See, e. g.,* Mock v. Rose, 472 F.2d 619, 621 (6th Cir. 1972), cert. denied, 411 U.S. 971, 93 S.Ct. 2156, 36 L.Ed.2d 693; Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104, 1106 (1968); Note, Due Process Considera-

is no evidence of bad faith or excessive zeal to obtain a conviction; nothing more than laziness, or perhaps just "sloppy" police work, seems to be involved. Nevertheless, since the use of the showup was not justified by any exigent circumstances, or even by any minimal showing of inconvenience, we have a case in which an unnecessarily suggestive identification procedure was employed. The confrontation was therefore defective for both of the reasons stated in *Biggers*; the showup increased the likelihood of misidentification, and that increased risk of error was gratuitous. 409 U.S. at 198, 93 S.Ct. 375, 34 L.Ed.2d 401. But, as the Court squarely held in that case—at least with respect to pre-*Stovall* identifications—these two defects, without more, do not necessarily result in a deprivation of due process.[21]

In Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387, the Court held that an in-court identification was permissible even though the witness had identified the three defendants at an unnecessarily suggestive lineup. In a lineup of six persons, only the three defendants had been required to speak; and only the one who wore a hat during the assault wore a hat during the lineup. These gratuitous and significantly suggestive aspects of the identification procedure did not offend due process because the evidence establishing the reliability of the identification was sufficiently persuasive to the Court. The holding in *Coleman* thus attaches overriding importance to the reliability factor in appraising the totality of circumstances.[22]

■ This conclusion is consistent with the Court's statement in *Biggers* that the "central question [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." The factors to be considered in deciding the reliability issue were then identified as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." 409 U.S. at 199–200, 93 S.Ct. at 382.

■ A consideration of those factors in this case requires the conclusion that Shard's identification of Kirby was sufficiently reliable to avoid the due process objection. The crime occurred in daylight and Shard testified unequivocally that he had a good opportunity to view his assailants before, during and after the crime. His description of the criminals made before the showup apparently fit the defendants. There was nothing at all uncertain about Shard's identification of Kirby and Bean. And finally, less than two days had elapsed between the crime and the confrontation. Therefore, without placing any weight on the corroboration resulting from the defendants' possession of the stolen property, the indicia of reliability satisfy the *Biggers* formulation.

Neil v. Biggers and Coleman v. Alabama involved pre-*Stovall* identifica-

---

tions in Police Showup Practices, 44 N.Y.U.L. Rev. 377, 387 (1969). Nor could this showup be justified because of the inability of the witness Shard to participate in a lineup, the situation in *Stovall* itself. Illinois has not argued that it would have been impossible to obtain reasonably comparable subjects to appear in a lineup, the justification put forth and rejected on the facts in Smith v. Coiner, 473 F.2d 877, 881 (4th Cir. 1973), cert. denied, 414 U.S. 1115, 94 S.Ct. 848, 38 L.Ed.2d 743. Finally, there is no evidence that Kirby had consented to the showup.

21. "Suggestive confrontations are disapproved because they increase the likelihood of mis-

identification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as *Stovall* makes clear, the admission of evidence of a showup without more does not violate due process." 409 U.S. at 198, 93 S.Ct. at 382.

22. Similarly, in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, the critical factor was the Court's confidence "that the identification of Simmons was correct . . . ." *Id.* at 385–386, 88 S.Ct. at 972.

tions. If the due process standard as applied in such cases remains the same in post-*Stovall* cases, we are satisfied that Kirby's objections must fail. We come, then, to the question whether a new constitutional rule must be applied to post-*Stovall* identifications.

## V.

A cryptic paragraph in Mr. Justice Powell's opinion in *Biggers* may imply that the Court will approve of a deterrent rule that would control this case. He said:

> What is less clear from our cases is whether, as intimated by the District Court, unnecessary suggestiveness alone requires the exclusion of evidence. While we are inclined to agree with the courts below that the police did not exhaust all possibilities in seeking persons physically comparable to respondent, we do not think that the evidence must therefore be excluded. The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process. Clemons v. United States, 133 U.S. App.D.C. 27, 48, 408 F.2d 1230, 1251 (1968) (Leventhal, J., concurring); cf. Gilbert v. California, 388 U.S. 263, 273, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178

(1967); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Such a rule would have no place in the present case, since both the confrontation and the trial preceded Stovall v. Denno, *supra,* when we first gave notice that the suggestiveness of confrontation procedures was anything other than a matter to be argued to the jury. 409 U.S. at 198–199, 93 S.Ct. at 382 (footnote omitted).

The arguments in favor of an exclusionary rule which would deter the police from conducting a showup when a lineup is feasible carry substantial force.

The primary purpose of such a rule would be to enhance the reliability of the trial process in its search for truth. Unlike the Fourth Amendment and Fifth Amendment exclusionary rules which make probative and trustworthy evidence inadmissible, this rule would be designed to minimize the danger of convicting the innocent. The purpose of this rule would be completely consistent with the fundamental purpose of the trial process itself.

There is surprising unanimity among scholars in regarding such a rule as essential to avoid serious risk of miscarriage of justice. Professional journals,[23] Judge Winter of the Fourth Circuit,[24] Chief Judge Bazelon and Judge Wright of the District of Columbia Circuit,[25] and the American Law Institute's Tentative Draft of the Model Code of Pre-Arraignment Procedures,[26] all take the position

---

**23.** *See* Grano, *Kirby, Biggers,* and *Ash:* Do Any Constitutional Safeguards Remain Against the Danger of Convicting the Innocent? 72 Mich.L.Rev. 717, 782–783 (1974); Recent Developments, Identification: Unnecessary Suggestiveness May Not Violate Due Process, 73 Colum.L.Rev. 1168, 1180 (1973); Note, Pretrial Identification Procedures— Wade to Gilbert to Stovall: Lower Courts Bobble the Ball, 55 Minn.L.Rev. 779, 794 (1971); Note, Due Process Considerations in Police Showup Practices, *supra* n. 20, at 392.

**24.** Smith v. Coiner, *supra* n. 19. *But see* the later Fourth Circuit decision in Stanley v. Cox, 486 F.2d 48, 52 (4th Cir. 1973), cert. denied, 416 U.S. 958, 94 S.Ct. 1975, 40 L.Ed.2d 309.

**25.** Wright v. United States, *supra* n. 19 (Bazelon, C. J., dissenting); Clemons v. United

States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1252 (1968) (Wright, J., concurring in part and dissenting in part). Judge Friendly has concluded that Judge McGowan, speaking for the *en banc* majority, was also of this view in *Clemons; see* United States ex rel. Phipps v. Follette, 428 F.2d 912, 914 n. 3 (2d Cir. 1970). *But see* United States ex rel. Pierce v. Cannon, *supra* p. 402, and the cases cited therein at n. 11, where we held, in the context of a poorly conducted lineup, that evidence of unnecessarily suggestive pretrial post-*Stovall* identifications need not be excluded if the *Biggers* indicia of reliability are present.

**26.** Model Code of Pre-Arraignment Procedure, Sections 160.1, 160.2 (Tent. Draft No. 6, 1974). *See also* Model Rules for Law Enforcement: Eyewitness Identification, Project on Law Enforcement Policy and Rulemaking,

that evidence of, or derived from, a showup identification should be inadmissible unless the prosecutor can justify his failure to use a more reliable identification procedure.

Since June 12, 1967, when *Stovall* was decided—indeed, since April 6, 1966, when the Fourth Circuit rendered its seminal decision in Palmer v. Peyton—the law enforcement profession has been on notice that the introduction of evidence of suggestive identifications may create constitutional error. It has been suggested that better identification procedures may well lead to higher, rather than lower, conviction ratios.[27] Inept police procedures, such as that disclosed by this record, may increase the likelihood that juries may discount eyewitness testimony and, therefore, under the reasonable doubt standard, acquit defendants who are in fact guilty.

Moreover, a simple exclusionary rule—instead of a requirement that the particular circumstances of one identification after another be evaluated on a case-by-case basis—might lessen the burden of judicial review of the many cases in which eyewitness identifications are challenged. Reviewing courts would not have to sift trial records to determine whether adequate evidence corroborating the reliability of the showup is present.[28] If a showup were employed, the only relevant question affecting admissibility of the station-house identification would be the justification, if any, for not holding a lineup.

Furthermore, as the district court, court of appeals, and Supreme Court opinions in *Biggers* indicate, the standards for determining when an identification is sufficiently reliable are somewhat

elusive and leave room for considerable judicial disagreement.

There is, indeed, good reason to favor the adoption of an exclusionary rule such as that proposed in the American Law Institute's Draft of a Model Code. May we, however, properly conclude that the enforcement of such a rule is mandated by the due process clause of the Fourteenth Amendment? We think not.

■ Our power to require the Illinois courts to observe any particular procedure, or to exclude any category of evidence offered at a criminal trial is, of course, derived solely from the Federal Constitution. With this premise in mind, we must first note that a showup does not itself violate any constitutional right of the suspect. Unlike a warrantless search, which may violate a constitutionally protected interest in privacy, the identification of a suspect—whether fair or unfair—does not necessarily affect any constitutionally protected interest of the suspect. The due process clause applies only to proceedings which result in a deprivation of life, liberty or property. The due process issue, therefore, does not arise until testimony about the showup—or perhaps obtained as a result of the showup—is offered at the criminal trial.[29] If that evidence is unfairly prejudicial, the trial judge may have a constitutional obligation to exclude it, or possibly to mitigate its impact by an appropriate cautionary instruction to the jury. But if a constitutional violation results from a showup, it occurs in the courtroom, not in the police station.

■ The Justices have plainly told us that the admission of evidence of a showup does not necessarily violate due process.[30] Logically, that statement ap-

College of Law, Arizona State University, Section 2 (1972), reprinted in Model Code of Pre-Arraignment Procedure, App. VII (Tent. Draft No. 6, 1974).

27. McGowan, Constitutional Interpretation and Criminal Identification, 12 Wm. & Mary L.Rev. 235, 241 (1970).

28. The D. C. Circuit's *en banc* decision in Clemons v. United States, supra n. 25, is a good example of the painstaking care needed in eyewitness identification cases under the *Biggers* test.

29. As Judge Leventhal observed in his concurring opinion in Clemons v. United States, the due process right at stake is the "right to a fair trial." 408 F.2d at 1250.

30. *See* note 21, *supra*. *See also* Douglas, J., dissenting in Biggers v. Tennessee, 390 U.S. 404, 408, 88 S.Ct. 979, 981, 19 L.Ed.2d 1267: "Of course, due process is not always violated when the police fail to assemble a lineup but conduct a one-man showup."

plies equally to showups which occurred after as well as before the *Stovall* decision.[31] For nothing in the *Stovall* decision itself implied that any redefinition of due process standards occurred on June 12, 1967. Indeed, quite the contrary inference might fairly have been drawn from the Court's characterization of the due process objection to the admissibility of showup testimony as "a recognized ground of attack upon a conviction independent of any right to counsel claim." 388 U.S. at 302, 87 S.Ct. at 1972.[32]

If we assume that judges are capable of differentiating between identification evidence which is so unfair as to be constitutionally inadmissible, and that which state courts may permit juries to assess, there is no compelling need—indeed, no need at all—for a general exclusionary rule. For on that hypothesis such evidence would be rejected on a case-by-case basis. The new rule, on this assumption, would not avoid any constitutional deprivation. Its entire impact would be as a deterrent to undesirable police conduct, which, in itself, is constitutionally unobjectionable. No matter how desirable the new rule may be, on this hypothesis we must conclude that the Constitution does not give us the power to impose it upon the states in this circuit.

If, on the other hand, we assume that the unfairness of showups is both so pervasive and so difficult to recognize that judges cannot fairly administer the existing totality of circumstances rule, then an adequate constitutional predicate for the new rule may be found. However, nothing in either the literature or our experience persuades us that the difficulties in applying the existing rule are so great that a new simple rubric is essential to forestall judicial error.[33]

---

**31.** Although Judge Leventhal's opinion in Clemons v. United States was addressed to the unfairness of adopting a retroactive exclusionary rule, his essential analysis is equally relevant to the question whether the due process clause provides a satisfactory predicate for such a prospective rule. He stated in part:

"In essence what the *Stovall* due process right protects is an evidentiary interest. Identification testimony is a particularly important kind of evidence, so important as to occasion exclusionary rulings that are sweeping in prospective application. But we are dealing here with the right to a retroactive condemnation of a pre-*Wade* admission of the identification evidence.

"It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the 'integrity'—of the adversary process.

"Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.

"Since the interest protected is in essence an evidentiary one, denial of the retroactive right recognized in *Stovall* and explicated in *Simmons* must depend on the assessment of all the factors and evidence bearing on the identification issue. The presence of other untainted identification testimony, counsel's opportunity to inquire into the circumstances of the challenged identification, and to bring out the facts, are all relevant to the consideration of overall due process fairness to the accused." 408 F.2d at 1251 (footnotes omitted).

**32.** It is true that in *Biggers* Mr. Justice Powell suggested that it would be particularly unfair to the law enforcement profession to apply a new exclusionary rule to a pre-*Stovall* show-up because the Court had not theretofore indicated that the suggestiveness of an identification was anything more than a matter of credibility to be argued to the jury. But since *Stovall* did not purport to fashion any general exclusionary rule—as opposed to an analysis of the circumstances of particular cases—it does not seem reasonable to interpret *Stovall* as marking the effective date of a brand new exclusionary rule. If the Court should elect to fashion such a new rule, possibly even in this very case, it would seem more consistent with the retroactivity analysis in the first portion of the *Stovall* opinion to make the rule effective from the date of the decision in which it is announced than from the date of the decision in *Stovall*. *See* Grano, *supra* n. 23, at 779 n. 383.

**33.** In Clemons v. United States, 133 U.S.App. D.C. 27, 408 F.2d 1230 (1968) (en banc),

■ Since the constitutional error that the rule is intended to avoid is an unfair trial, rather than merely an unfair identification, before an inflexible exclusionary rule is adopted it is appropriate to consider less drastic methods of avoiding the danger of unfairness. It is important to remember that identification testimony normally has *some* probative significance even if the identification procedure was unnecessarily suggestive. The risk of unfairness stems from the danger that juries may attach more weight to the evidence than it actually warrants. That danger can be minimized by appropriate cautionary instructions.[34] A rule which invariably required the exclusion of evidence, no matter how slight the danger that the particular trial was actually unfair, would be at odds with our well-settled interpretation of the due process clause as providing "an elastic, flexible standard which varies with the attendant circumstances." La-Batt v. Twomey, 513 F.2d 641, at 645 (7th Cir. 1975).

The risk that the jury will not properly assess the weight to be given identification testimony will obviously vary widely from case to case, just as the jury's ability to assess other forms of evidence of dubious reliability will vary. There are elements of unfairness in every trial in which the instructions to the jury are imperfect, in which questionable testimony is presented, or in which members of the jury are less attentive or less perceptive in assessing credibility than the ideal. On the other hand, there are obviously many situations in which there is no unfairness at all in the admission of showup testimony. If, for example, the victim of a violent crime informed the police that his assailant was his brother, or perhaps a close friend of many years, it would be absurd to criticize the police for having the victim identify a suspect in a one-to-one confrontation. The range of variation—from no unfairness at one extreme, through situations in which the jury can be safely relied upon to recognize the suggestive factors and discount the reliability of the identification, to the other extreme in which wholly unreliable evidence is nevertheless so persuasive that fundamental fairness requires that it be excluded—is itself a persuasive reason for not concluding that an inflexible exclusionary rule is mandated by the Constitution.

The rule which is needed is one that can be drafted more effectively by the legislative process than by a somewhat clumsy judicial fiat. For it is clear that all showup evidence should not be excluded, that the distinction between a showup and a lineup is somewhat illusory,[35] that there is room for debate as to what justifications for a showup should be accepted, and that the objections to suggestive showups may apply equally to a variety of suggestive lineups.[36] The several issues which must be addressed

Judge McGowan described the present due process rule as "a broad standard of review which focuses upon the distinctive facts of each case in their totality, and which relies very heavily upon the special capacity and experience of judges, trial and appellate, to discriminate between real and fancied dangers of the miscarriage of justice." *Id.* at 1237.

**34.** Professor Grano, in his article in 72 Mich. L.Rev. 719, 794–797 (1974), suggests that in the absence of an exclusionary rule of evidence the Constitution may require trial judges to give a jury instruction which adequately emphasizes the unreliability of identification testimony, stressing the risks inherent in suggestive procedures. Trial judges should, of course, give such instructions in appropriate cases; moreover, although a general rule requiring such instructions may well be desirable, the reasons which persuade us that an exclusionary rule of evidence is not constitutionally required also would require rejection of this suggested constitutional rule.

**35.** For example, should a succession of showups in which the victim rejects the suggested identification, as occurred in *Biggers,* followed by a showup in which he makes the identification, be treated as a lineup or a showup? Conversely, should a lineup including five blacks and one white be treated as a showup if the victim identified his assailant as a white?

**36.** The suggestive procedures described in United States v. Wade, 388 U.S. at 232–233, 87 S.Ct. 1926, 18 L.Ed.2d 1149, do not place showups in a different category from other manifestly improper identification procedures.

in the formulation of the new rule require more than judicial gloss for adequate resolution.

The adoption of a new rule which would make justification for the use of a suggestive procedure, rather than the reliability of the identification, the critical factor in testing admissibility is more appropriately the subject of a legislative decision than of constitutional adjudication. For a holding that the due process clause has been violated assumes a degree of unfairness in the trial that offends our basic sense of justice. It would be most anomalous to fashion a rule of constitutional law which at once excluded identification evidence offered against one defendant on the ground that it was so unfairly persuasive as to taint the entire trial, and yet admit against another defendant evidence that was equally unreliable and equally prejudicial simply because reasons of police or prosecutorial expediency afforded adequate justification in the second case. As a constitutional matter, reliability— rather than justification for reasons extraneous to the fairness of the trial—is properly regarded as the factor of critical importance.

Accordingly, accepting for purposes of our decision the desirability of adopting an exclusionary rule such as that recommended in the American Law Institute's Tentative Draft No. 6 of a Model Code of Pre-Arraignment Procedure, we conclude that the Federal Constitution does not require the states to observe such a rule.

Affirmed.