COMMONWEALTH *vs.* CARLOS BOTELHO.

Suffolk.   December 2, 1975. — March 5, 1976.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & WILKINS, JJ.

*Identification.*

On a motion to suppress in-court and out-of-court identifications of a defendant by an eyewitness to a killing, evidence that the witness's observation of the assailant was over a substantial distance in dim lighting when she was influenced by alcohol, that her description of the gunman immediately after the incident was very general and did not accurately describe the defendant, that she failed to identify a picture of the defendant among a group of photographs shown to her by the police, that she was taken by a police officer to a court house to view the defendant who was appearing in court that day on unrelated charges, and that upon viewing the defendant leaving the court house in handcuffs between two court officers, she stated that he was positively not the assailant and described the features that distinguished him from the assailant, warranted a finding by a judge, following the procedure and standard derived from *United States* v. *Wade,* 388 U.S. 218 (1967), *Gilbert* v. *California,* 388 U.S. 263 (1967), and *Stovall* v. *Denno,* 388 U.S. 293 (1967), that the witness's subsequent identifications of the defendant as the gunman were tainted by the suggestive confrontation at the court house.   [865-870]

Discussion of the analysis suggested by the Supreme Court of the United States in *Neil* v. *Biggers,* 409 U.S. 188 (1972), with regard to the admission or exclusion of evidence regarding identifications by a witness.   [870-873]

On the Commonwealth's appeal from an order granting a motion by a defendant in a criminal case to suppress in-court and out-of-

court identifications by a witness, the Commonwealth's failure to argue that the judge should have applied a standard of law departing from the *Wade-Gilbert-Stovall* cases resulted in an abandonment of that issue. [873]

INDICTMENT found and returned in the Superior Court on June 8, 1974.

A pre-trial motion to suppress evidence was heard by *Lappin*, J.

The case was reported by *Braucher*, J., following his allowance of the Commonwealth's motion for an interlocutory appeal in the Supreme Judicial Court for the county of Suffolk.

*Alan L. Kovacs*, Assistant District Attorney, for the Commonwealth.

*Paul A. D'Agostino, Jr.*, for the defendant.

KAPLAN, J.    The defendant Carlos Botelho is under indictment for the murder in the first degree of Lawrence S. Salvucci.    The defendant moved before trial to suppress in-court and out-of-court identifications of him by one Marie Kearney.    After an extended hearing, a judge of the Superior Court made findings and allowed the motion.    The Commonwealth applied for interlocutory appeal pursuant to G. L. c. 278, § 28E, and leave was granted by a single justice of this court.

1. The judge's findings, amplified by some details taken from the transcript, yield the following picture of the Kearney confrontations and identifications.    The murder occurred on March 5, 1974, at approximately 2 A.M. in the lobby of the Cockatoo Lounge in Cambridge.    Mrs. Kearney worked in the lounge several evenings a week as a cocktail waitress, but this night she went to the lounge to socialize, arriving about nine thirty.    She had three or four full drinks of Scotch whiskey in a "rock" glass and stayed after closing to assist Lawrence Salvucci, one of the managers, in straightening up the bar.    They heard a noise and Salvucci went out to the lobby to investigate. He returned, jumped over the bar to get something, and went out again.    Mrs. Kearney followed him into the

lobby, which is shared by several bars and a restaurant. She saw two men above her on the balcony where the offices of the complex are located. She indicated to Salvucci where the men were. As Salvucci ran up the stairs toward them, one of the men drew a gun and shot and killed him. Mrs. Kearney turned and ran back through the Cockatoo, out a fire exit, and to the desk area of a neighboring motel. Police were summoned but arrived too late to pursue Salvucci's assailants.

Mrs. Kearney had viewed the men on the balcony for approximately a minute (by her estimate) at a distance of twenty-five to thirty feet under subdued illumination. She was able to give the police only a general description of the gunman — "a white male, approximately five foot ten, early twenties, long brown hair, brown jacket on." (In fact, as the judge noted, the defendant had black hair.) After taking Mrs. Kearney's story, the police drove her to Watertown Square to view two suspects, but she said they were not involved because both had beards. The police then took her to the Cambridge and later to the Arlington police stations to view photographs (the defendant's picture was not among them). She did not match any to her recollection of the gunman though she picked out several pictures as resembling the second man. After dawn she went to the home of a friend, but was unable to sleep.

Meantime an Arlington police officer suggested to the Cambridge police that the defendant's photograph be shown to Mrs. Kearney. The officer knew that the defendant worked in a car wash near the Cockatoo, thought his reputation was bad, and believed he fit the description. It may be that the officer's attention was attracted to the defendant because the officer was to appear in the District Court of Lowell that day to prosecute the defendant for motor vehicle offenses.

Mrs. Kearney appeared at the Cambridge police station about noon and examined an array of photographs that included a picture of the defendant. She failed to

identify him. The judge examined the picture and concluded that it reasonably represented the defendant although it had been taken one or two years previously.

The Cambridge police then told Mrs. Kearney that she would be taken to Lowell to view a suspect. The Arlington police officer who was prosecuting the defendant had learned that the defendant and a brother worked part time in the motel next to the Cockatoo, and that the defendant recently had acquired some money. Therefore the officer had recommended that the witness view the defendant. He arranged to have the defendant held in custody in Lowell on a capias that had issued when the defendant failed to arrive on time for his court engagement. Mrs. Kearney, accompanied by her friend John Esposito, a barman at the Cockatoo, was brought to the Lowell court house. Cambridge officers spoke briefly there with an assistant district attorney who advised them not to display the defendant to the witness in the court room — the court room would be empty except for the handcuffed defendant and two court officers. Instead, the Cambridge officers contrived to display the defendant as he left the court house. Mrs. Kearney and Esposito were taken in a car to a court house parking lot where they could have a view of the rear entrance. Mrs. Kearney then observed the defendant as he came out the door between two court officers, both dissimilar in appearance to the defendant. The defendant's hands were secured and he walked within a few feet of the car on a bright sunny day. The police officer who was with Mrs. Kearney testified that she said, "That's positively not him. His hair is too long and his complexion is too dark." Mrs. Kearney testified at the suppression hearing, with Esposito agreeing, that she said, "It looks exactly like him featurewise only his hair is too dark." She testified as well, however, that she thought at the time that the defendant's complexion also was not the same as the gunman's. In any event she informed the police that she could not identify the defendant as the gunman.

Several days later Mrs. Kearney was seated at the bar of the Cockatoo. She testified at the suppression hearing that she went to the Cockatoo because she did not want to be alone, although she had testified earlier at the probable cause hearing that her purpose was to see if the man who killed Salvucci would come into the lounge. The defendant, who was apparently working that night at one of the other bars in the complex, was sent to the Cockatoo to borrow a cocktail shaker.[1] Mrs. Kearney observed the defendant from a distance of eight to ten feet in the intimate lighting of the lounge, and after he left, she called over Esposito and said, "That's him, John."

The police arrived within minutes and arrested the defendant. They brought him handcuffed before Mrs. Kearney and she identified him as Salvucci's killer (as she subsequently did at the probable cause hearing). The police did not inquire at the time why she had been unable to identify him in Lowell but she testified at the suppression hearing that she had not realized the defendant was the man because of a difference in lighting.

When testimony was concluded on the motion to suppress, the prosecution acknowledged that the Lowell confrontation was suggestive. Counsel argued, however, that the subsequent identifications by Mrs. Kearney should be admitted because all believable evidence should reach the jury and the case for exclusion was not strong enough here. The judge, without challenge by the Commonwealth, framed the issue before him thus: whether the subsequent identifications should be excluded "on the grounds that [they] had no independent origin." In ruling on the motion, the judge summarized the evidence and found that "the Commonwealth has failed

---

[1] The manager of the other bar, who sent the defendant on the errand, knew at this time that Mrs. Kearney had viewed the defendant at the Lowell court house.

to establish by clear and convincing evidence that the
in-court identification and, in fact, the identification at
the probable cause hearing were based on observations
other than the . . . [observations of the defendant
subsequent to the crime]. The Court finds that the
probable cause identification and the in-court identifica-
tion were tainted as a result of impermissible confronta-
tions prior [there]to." The judge added, "The circum-
stances of the confrontation were so [un]necessarily
suggestive that they did create the extreme likelihood that
the identification was tainted and that the government
has failed to establish by clear and convincing evidence
otherwise."

On its application for interlocutory appeal the
Commonwealth stated both that the judge applied an
improper standard of law, and that his decision to
suppress was not supported by the evidence. But in its
brief in this court the Commonwealth argued only the
latter issue.

2. The judge followed the procedure and standard
derived from the *Wade-Gilbert-Stovall* cases[2] as generally

---

[2] *United States* v. *Wade,* 388 U.S. 218 (1967). *Gilbert* v. *Cali-
fornia,* 388 U.S. 263 (1967). *Stovall* v. *Denno,* 388 U.S. 293 (1967).
In these cases the Supreme Court first manifested its concern with the
fact that "the confrontation compelled by the State between the ac-
cused and the victim or witnesses to a crime to elicit identification
evidence is peculiarly riddled with innumerable dangers and variable
factors which might seriously, even crucially, derogate from a fair
trial." *United States* v. *Wade,* 388 U.S. at 228.

In *Wade* the Supreme Court held that a post-indictment lineup
was a critical stage of the prosecution at which the accused had a
Sixth Amendment right to counsel. The Court held, however, that
the prosecution was entitled to have the witness identify the defend-
ant in court if it could establish "by clear and convincing evidence
that the in-court identifications were based upon observations of the
suspect other than the lineup identification." 388 U.S. at 240. With
regard to the uncounseled lineup itself, the Court adopted in *Gilbert*
a per se rule that testimony offered by the prosecution concerning the
lineup must be excluded. In *Stovall* the Court held that *Wade* and
*Gilbert* would not be applied retroactively. But the Court ruled in a
brief statement that identifications might nonetheless be suppressed on

understood. In brief résumé: When it appears that the prosecution intends to use an eyewitness of the crime to identify the defendant at trial, the defendant may show at a suppression hearing that the witness was subjected by the State to a confrontation that was unnecessarily suggestive and thus offensive to due process. If this is established, then the prosecution is barred from putting the particular confrontation in evidence at the trial[3] — there is a "per se" exclusion. Further, the prosecution is limited to introducing at trial only such identifications by the witness as are shown at the suppression hearing not to be the product of the suggestive confrontation — the later identifications, to be usable, must have an independent source. It would be open to the defendant, however, if he chose, to attempt to attack and weaken the prosecution's case at trial by introducing the suggestive confrontation and arguing to the trier that it did corrupt any later identifications including the in-court identification.[4]

---

due process grounds; the question was whether "the confrontation . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." 388 U.S. at 301-302. Because *Wade* and *Gilbert* were subsequently confined to postindictment corporeal identifications (see *United States* v. *Ash,* 413 U.S. 300 [1973]; *Kirby* v. *Illinois,* 406 U.S. 682, 688-690 [1972]), the defendant here does not challenge the identifications on the basis of the Sixth Amendment bar. See Hennessey & others, Constitutional Rights of the Accused, 60 Mass. L.Q. 18, 28-31 (1975).

[3] In the present case it happens the prosecution would have no motive to offer the suggestive confrontation at the Lowell court house because the witness did not identify the defendant as the gunman at that time.

[4] See the summary statement in *Clemons* v. *United States,* 408 F.2d 1230, 1237 (D.C. Cir. 1968) (en banc), cert. denied, 394 U.S. 964 (1969), indicating that the procedure on due process violations (*Stovall*) was assimilated to that for violations of the Sixth Amendment (*Wade* and *Gilbert*). See note 2 *supra.* See also *Commonwealth* v. *McGrath,* 361 Mass. 431, 434-438 (1972); *Commonwealth* v. *Kazonis,*

In deciding whether a particular confrontation was unnecessarily suggestive, the judge is to consider "the totality of the circumstances surrounding it" (*Stovall*, 388 U.S. at 302). This has been understood to refer to the episode itself; it does not extend to a consideration of the witness's entire connection with the case to determine whether the confrontation, although set up in such a way as to be unnecessarily suggestive, was nevertheless reliable, and therefore usable — for example, because the witness had a clear perception of the offender and would not be misled by a one-on-one confrontation or the like.[5]

Finally, as to burdens, it is for the defendant to establish, apparently by a preponderance, that a given confrontation was unnecessarily suggestive. See *Commonwealth* v. *Fancy*, 349 Mass. 196, 202 (1965) (general rule that burden on motion to suppress evidence is on moving party);[6] Sobel, Assailing the Impermissible

---

356 Mass. 649, 651-653 (1970); N. Sobel, Eye-Witness Identification: Legal and Practical Problems §§ 5-10, 35-40 (1972).

Because the Supreme Court's decision in *Kirby* v. *Illinois*, 406 U.S. 682 (1972), undercut the application of *Wade* and *Gilbert* to pre-indictment identifications, see *Commonwealth* v. *Horton*, 365 Mass. 164, 177 & n.3 (1974) (Hennessey, J., concurring), the procedures set out in *Wade* and *Gilbert* have had continuing vitality chiefly in their adaption to the due process context.

[5] Such evidence, external to the confrontation, rather enters necessarily into the second stage if that is reached — consideration of the question whether the witness's ability to identify had an independent source. See Pulaski, *Neil* v. *Biggers*: The Supreme Court Dismantles the *Wade* Trilogy's Due Process Protection, 26 Stan. L. Rev. 1097, 1112-1113 (1974); N. Sobel, *supra* note 4, § 37, at 66-68 (1972). If external evidence were considered in evaluating the suggestiveness of a confrontation, it would seem that the second-stage inquiry would be superfluous. This point has not always been observed by courts. See Note, Pretrial Identification Procedures — *Wade* to *Gilbert* to *Stovall*: Lower Courts Bobble the Ball, 55 Minn. L. Rev. 779, 787 (1971).

[6] In *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 56-57 (1974), we held that when a search is made without a warrant, the burden of establishing its reasonableness is on the Commonwealth because

Suggestion: Evolving Limitations on the Abuse of Pre-trial Criminal Identification Methods, 38 Brooklyn L. Rev. 261, 289 (1971). If the defendant sustains his burden, then, should the prosecution desire to offer identification testimony, it must assume the burden of establishing by "clear and convincing evidence" that the proffered identification has a source independent of the suggestive confrontation. See *Wade,* 388 U.S. at 240; *Commonwealth* v. *Finn,* 362 Mass. 206, 208 (1972); *Commonwealth* v. *McGrath,* 361 Mass. 431, 437-438 (1972); *Commonwealth* v. *Kazonis,* 356 Mass. 649, 651-653 (1970); *United States* v. *Sanders,* 479 F.2d 1193, 1198 (D.C. Cir. 1973); *People* v. *Caruso,* 68 Cal. 2d 183, 189-190 (1968) (en banc); *People* v. *Damon,* 24 N.Y.2d 256, 261 (1969); N. Sobel, *supra* note 4, § 38, at 70.[7]

Analyzing the evidence before him in the light of these precepts, the judge below concluded that none of the identifications could be put in evidence by the prosecution at trial. Our function on review is to consider whether the evidence supported the judge's findings of fact, due respect being paid to his superior opportunity to observe and weigh the testimony; then we are to see whether the findings justify the judge's decision in law. See *Commonwealth* v. *Stanley,* 363 Mass. 102, 104 (1973); *Commonwealth* v. *Murphy,* 362 Mass. 542, 547 (1972); *Commonwealth* v. *Frank,* 357 Mass. 250, 254 (1970).

The fact findings here are clearcut and substantially beyond dispute. Do they permit a conclusion that the

such searches "are presumed in the first instance to be unreasonable." *Id.* at 57. No similar presumption of unnecessary suggestiveness has been adopted as to police-arranged confrontations.

[7] As to the introduction of a standard intermediate between "preponderance" and "beyond a reasonable doubt," see the discussion in *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 870-871 (1975), and Quirico, J., concurring in part and dissenting in part, at 872-877.

Commonwealth had not sustained its burden of establishing that the witness's identifications derived from a source independent of the tainted confrontations? Some of the relevant considerations are: "(1) The extent of the witness' opportunity to observe the defendant at the time of the crime; prior errors, if any, (2) in description, (3) in identifying another person or (4) in failing to identify the defendant; (5) the receipt of other suggestions, and (6) the lapse of time between the crime and the identification." *Commonwealth* v. *Ross*, 361 Mass. 665, 671 n.2 (1972), judgment vacated on other grounds, 410 U.S. 901 (1973), quoting from *Allen* v. *Moore*, 453 F.2d 970, 975 (1st Cir.), cert. denied, 406 U.S. 969 (1972); see *United States* v. *Wade*, 388 U.S. 218, 241 (1967); cf. *Neil* v. *Biggers*, 409 U.S. 188, 199-200 (1972).

With regard to the witness's opportunity to view the defendant at the scene of the crime, her observation of the killing was over a substantial distance in dim lighting when she was influenced by alcohol. Her description of the gunman after the incident was not only very general, but also did not accurately describe the defendant because of the difference of hair color. Although the time between the crime and the two observations — the second display of pictures at the Cambridge police station and the showup at Lowell — was short, the witness had no certainty that the defendant was the man; at the Lowell showup she even mentioned the defendant's features that distinguished him from the gunman. Only after this parading of the defendant past the fatigued witness in a suggestive fashion did she begin to fix on him. As to the witness's slowly developed assurance in her identification, the Supreme Court's statement about suggestive photographic displays is pertinent: "[T]he witness . . . is apt to retain in his memory the image of the photograph rather than of the person actually seen." *Simmons* v. *United States*, 390 U.S. 377, 383-384 (1968). See Grano, note 12 *infra,* at 747: "In psychological terms, the witness's mental image of the defendant

formed after careful viewing at the identification procedure probably overshadows his or her earlier mental image of the actual offender." (Footnote omitted.) See also Eisenberg & Feustel, note 11 *infra* at 660.

The present case resembles *Foster* v. *California,* 394 U.S. 440 (1969), where identification procedures were found to violate due process. There a defendant, charged with armed robbery, was first displayed to the witness in a three-man lineup in which he stood out from the others by the contrast of his height and by the fact that he was wearing a leather jacket like that worn by the robber. As the witness could not positively identify the defendant, the police allowed a one-on-one confrontation, at which the witness still was not sure of the identification. Only at a lineup some days later did the witness identify the defendant as the robber. The Court noted that " [t]he suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness, '*This* is the man.'" *Id.* at 443. The findings here indicate that the Lowell court house and postarrest confrontations had a similar effect.[8]

We conclude that the judge's suppression of all the identifications was warranted and should stand.

3. As noted above, the prosecution has not urged the adoption of a procedure or standard departing from the *Wade-Gilbert-Stovall* cases and their elaboration which have guided decision in this Commonwealth.[9] We

---

[8] For similar fact situations, see, e.g., *United States* v. *Sanders,* 479 F.2d 1193 (D.C. Cir. 1973); *United States* v. *Gambrill,* 449 F.2d 1148, 1150-1159 (D.C. Cir. 1971); *Harris* v. *State,* 350 A.2d 768 (Del. 1975).

[9] See *Commonwealth* v. *Ferguson,* 365 Mass. 1, 6-7 (1974); *Commonwealth* v. *Ross.* 361 Mass. 665, 670-676 (1972), judgment vacated on other grounds, 410 U.S. 901 (1973); *Commonwealth* v. *McGrath,* 361 Mass. 431, 434-438 (1972); *Commonwealth* v. *Kazonis,* 356 Mass. 649, 651-653 (1970).

observe, however, that *Neil* v. *Biggers,* 409 U.S. 188 (1972),[10] and some cases decided in its wake, e.g., *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397 (7th Cir.), cert. denied, 421 U.S. 1016 (1975), suggest that an approach differing from the strict "independent source" analysis may be constitutionally permissible.

The crime and trial in the *Biggers* case were pre-*Stovall.* The defendant, accused of rape, had been observed by the victim briefly, at the time of the attack in her home, under illumination from another room, and subsequently in the moonlight after she had been forced to go outside. The victim gave the police a general description and then identified the defendant seven months later at a showup in which the defendant was accompanied only by police officers. The victim was permitted to testify about the showup identification although that in itself had taken place under suggestive conditions: "per se" exclusion was not called for, according to the Court, because in the Court's view the identification was reliable. "[T]he central question," the Court thought, was "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." 409 U.S. at 199. Although not acknowledging that the case departed from prior law, the Court may thus have expanded "the totality of the circumstances" as found in *Stovall,* where the phrase appeared to refer only to the first stage inquiry about the conditions of the challenged confrontation and any police justification for it, to take in external evidence that the witness was not misled by the police practice. See *United States ex rel. Pierce* v. *Cannon,* 508 F.2d 197, 204 n.11 (7th Cir. 1974). It can be thought to follow from *Biggers* that there is no shift of burden from defendant to the prosecution as under

---

[10] A majority of five joined in the main opinion and three Justices concurred in part and dissented in part. The division was on a matter irrelevant to our present discussion. See note 14 below.

*Wade-Gilbert-Stovall.* See Pulaski, *supra* note 5, at 1112, 1116.[11] "Suggestiveness" and reliability would be interwoven and the defendant's burden would persist throughout. We may add that *Biggers* would tend toward a rule of either total admission or exclusion of all the evidence regarding identifications by a witness; at least it would seem that if the identification at a suggestive confrontation is found reliable, then subsequent identifications would also appear reliable. See *Government of the Virgin Islands* v. *Navarro,* 513 F.2d 11, 16-18 (3d Cir.), cert. denied, 422 U.S. 1045 (1975) (semble); *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397, 403 n.17 (7th Cir.), cert. denied, 421 U.S. 1016 (1975); Hennessey and others, *supra* note 2, at 30.

The *Biggers* case is a hard one to construe, and overall there is a serious doubt whether the approach was intended to apply at all to post-*Stovall* confrontations.[12] The doubt arises from a passage in the *Biggers* opinion,

---

[11] Evidence which on the *Wade-Gilbert-Stovall* formulation would be relevant in showing that the witness's capability to identify the offender had a source independent of the suggestive confrontation would be the same as the evidence that, under *Biggers,* would show the suggestive identification to be reliable. Compare note 5 above. See Eisenberg & Feustel, Pretrial Identification: An Attempt to Articulate Constitutional Criteria, 58 Marq. L. Rev. 659, 668 (1975).

[12] Not applicable to post-*Stovall* confrontations: see *Brathwaite* v. *Manson,* 527 F.2d 363, 368-371 (2d Cir. 1975); *United States* v. *Jones,* 517 F.2d 176, 180 (D.C. Cir. 1975); *Smith* v. *Coiner,* 473 F.2d 877, 882 (4th Cir.), cert. denied, 414 U.S. 1115 (1973) (but see a decision by another panel, *Stanley* v. *Cox,* 486 F.2d 48 [4th Cir. 1973], cert. denied, 416 U.S. 958 [1974]); *Thomas* v. *Leeke,* 393 F. Supp. 282, 286-287 (D.S.C. 1975); Grano, *Kirby, Biggers, & Ash:* Do Any Constitutional Safeguards Remain against the Danger of Convicting the Innocent, 72 Mich. L. Rev. 719, 776-779 (1974); cf. *Flaherty* v. *Vinzant,* 386 F. Supp. 1170, 1173 n.3 (D. Mass. 1974). Applicable: see *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397, 405-409, 407 n.32 (7th Cir.), cert. denied, 421 U.S. 1016 (1975); *Harris* v. *State,* 350 A.2d 768, 773 (Del. 1975); *Dobson* v. *State,* 24 Md. App. 644, 654 (1975).

reproduced in the margin,[13] which suggests that a standard stressing "reliability" was appropriate to a period antedating the Court's first expressed constitutional concern over identification testimony, while a stricter rule should apply thereafter designed in part to deter the police from using improper procedures. See Recent Developments, note 16 *infra*, at 1179. A recent case, *Brathwaite* v. *Manson*, 527 F.2d 363 (2d Cir. 1975) (Friendly, J.), after a comprehensive analysis, concludes that *Biggers* applies only to pre-*Stovall* identifications and was not intended to alter the law as to later cases.[14]

4. We think this is not an appropriate case in which to attempt to decide whether a *Biggers* approach as sketched above should be applied to a post-*Stovall* identification.[15] The Commonwealth has chosen not to

---

[13] "The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process. *Clemons* v. *United States*, 133 U. S. App. D.C. 27, 48, 408 F. 2d 1230, 1251 (1968) (Leventhal, J., concurring); cf. *Gilbert* v. *California*, 388 U. S. 263, 273 (1967); *Mapp* v. *Ohio*, 367 U. S. 643 (1961). Such a rule would have no place in the present case, since both the confrontation and the trial preceded *Stovall* v. *Denno*, *supra*, when we first gave notice that the suggestiveness of confrontation procedures was anything other than a matter to be argued to the jury." 409 U.S. at 199.

[14] Judge Friendly found his construction was "powerfully supported," *id.* at 368, by analysis of the citations in the passage reproduced at n.13. He drew support from the decisions of other courts in point, *id.* at 369, and from the setting of *Biggers* in the sequence of Supreme Court and lower court decisions that commenced with *Wade* and *Stovall*.

We observe that Judge Friendly's conclusion is confirmed by the comment of the three Justices who concurred in part and dissented in part in *Biggers* (see note 10 *supra*). They said the question before the Court concerned "a pre-*Stovall* identification obtained as a result of an unnecessarily suggestive showup." 409 U.S. at 202.

[15] This court has cited the *Biggers* case only once and that without having to consider whether it presented an issue regarding the proper

argue for such a position and may be held to abandon it for purposes of the case on analogy to the rule which holds that the defense abandons an assignment of error which it does not argue. See *Commonwealth* v. *Caine*, 366 Mass. 366, 367 n.1 (1974).

It may, indeed, be that the Commonwealth upon consideration would elect to forgo any immediate advantage it might derive from a *Biggers* approach and prefer a regime which clearly discountenances suggestive confrontations. The point is well made by Judge McGowan in a comment on the *Wade* rule as to uncounseled lineups: "There are . . . real benefits to be realized by the prosecution, and the public it represents, in presenting evidence of a pretrial identification made under conditions which vouch for its fairness and, hence, its probable accuracy. An identification made at a lineup with counsel present is more likely to impress the jury than any number of vehement assertions from the witness stand that the defendant is the man. In appearing to construe the Sixth Amendment broadly, therefore, the Supreme Court may conceivably have caused the conviction ratio to increase." McGowan, Constitutional Interpretation and Criminal Identification, 12 Wm. & Mary L. Rev. 235, 241 (1970). A refusal to press for change in the *Biggers* direction may on mature reflection appear to the Commonwealth to be in its best long-range interests; we should not peremptorily assume the contrary. It is noteworthy that the codification by the American Law Institute of the subject of identification is consonant with the stricter rule. A Model Code of Pre-Arraignment Procedure § 160.7 (Proposed Official Draft 1975).[16]

---

analysis of identification testimony. *Commonwealth* v. *Torres*, 367 Mass. 737, 740 (1975).

[16] The Model Code outlines procedures to be followed by law enforcement agencies in respect to identification. See §§ 160.1-.5. If violation of the procedures is substantial, then the particular identifi-

Strictly, then, we need not undertake to decide whether the identification in question here would be properly excluded by the judge if an hypothesized *Biggers* standard were applied. But the analysis of the case at point 2 above would suggest the likelihood that the defendant could sustain a burden of showing that the witness's final identifications of him lacked reliability. This view is strengthened by the judge's emphatic statement that "[t]he circumstances of the confrontation were so [un]necessarily suggestive that they did create the extreme likelihood that the identification was tainted . . . ."

*Order affirmed.*

---

cation must be suppressed. § 160.7(1). If the defendant moves to suppress an identification because of a violation of the Code, then the burden is on the prosecution to qualify the identification for admission; ordinarily the showing is to be by a preponderance, but if the law enforcement agency has not taken steps in good faith to comply with the Code, or if in the particular case officers have failed to comply diligently and in good faith with sections of the Code requiring records of the identification, then the "clear and convincing" standard is imported. § 160.7(5). If an identification is suppressed, then any subsequent identification is suppressed unless the prosecution can show by clear and convincing evidence that that identification is not based on or significantly influenced by the prior identification. § 160.7(4).

See also the commentary favoring the stricter rule deriving from *Wade.* Grano, *supra* n.12, at 782-783; Pulaski, *supra* n.5, at 1120; Recent Developments, Identifications: Unnecessary Suggestiveness May Not Violate Due Process, 73 Colum. L. Rev. 1168, 1180 (1973).