Cowin, J.
The defendant, Cesar A. Diaz, is charged in three indictments with armed robbery (G.L.c. 265, §17); assault and battery by means of a dangerous weapon (G.L.c. 265, §15A); and larceny of a motor vehicle (G.L.c. 266, §28).
The defendant has filed a motion to suppress as evidence against him an identification made by the victim. The defendant argues that the police identification procedure was impermissibly suggestive and, further, that the police’s stop and detention of the defendant was made without any reasonable and articulable suspicion. A hearing was held on Monday, November 15, and Wednesday, November 17, 1993. The victim Jay LeBlanc and Haverhill police officers David Chambers and Dana Burrill testified. After the hearing and evaluation of the evidence, including the credibility of the witnesses, the Court denies the defendant’s motion.
FINDINGS OF FACT
On February 20, 1993, Jay LeBlanc, a taxi driver for Courtesy Cab Company in Haverhill, was sent to 116 White Street at approximately 9 p.m. for a fare to go to a skating rink. As Mr. LeBlanc approached 116 White Street, he saw three Hispanic males and one woman there. The three men got in the cab, two in the back seat and one in the front passenger seat. The front passenger said that the group wanted to go to Skateland. During the seconds that the man in the front seat was speaking, Mr. LeBlanc was looking at his face. The light inside the cab was on at that time, as Mr. LeBlanc had turned it on to write down the destination of his fares. Light also emanated from stores in the area and from street lights.
*534 Mr. LeBlanc turned the cab around to drive to Skateland. As he did so, he had another opportunity to see the face of the front seat passenger. As the taxi went from White Street to Emerson Street, Mr. LeBlanc turned and looked at the face of the front passenger again. Mr. LeBlanc saw that the man was starting to put on a hood. His face could still be seen despite the hood as it did not cover his face.
As Mr. LeBlanc drove down Emerson Street, the man sitting directly behind him placed a sharp object to his throat. The man in the front passenger seat said: “Give me all your money.” This same man also directed Mr. LeBlanc to take a right, and Mr. LeBlanc did so. The man in the front seat then put his hands into Mr. LeBlanc’s pocket and took his money. The man behind Mr. LeBlanc continued to hold the sharp object to the taxi driver’s throat. The man in the front seat disconnected the radio in the cab. While he did this, Mr. LeBlanc again looked at him face-to-face.
At one point on Washington Street, Mr. LeBlanc pulled his taxi to the right side of the street and was asked by the passengers if he had a wallet. He said “No.” Mr. LeBlanc was then directed to take a right. He did that. The passengers instructed Mr. LeBlanc to make further turns. Eventually they arrived at Duncan Street, a dark area with buildings on both sides.
The passenger in the front seat directed Mr. LeBlanc into a parking lot on Duncan Street. This man told Mr. LeBlanc: “Get the fuck out of the car.” Mr. LeBlanc did so. The front seat passenger then slid over to the driver’s seat and drove off in Mr. LeBlanc’s cab.
Mr. LeBlanc was in the taxicab with the three men for approximately ten minutes. Throughout that time the man in the front passenger seat was speaking to Mr. LeBlanc.
The man in the front seat was described at the hearing by Mr. LeBlanc as 5’8” to 5T0” tall, average weight (a thin-to-medium build), one hundred and forty to one hundred and fifty pounds. His skin was tannish, light, “not real black, not real white.” His hair was blackish, darkish hair, wavy or Afro. He wore a red Chicago Bulls parka.
After Mr. LeBlanc left the taxicab, he went to a nearby Store 24 on Duncan Street to telephone his cab company. That walk took approximately five minutes. Mr. LeBlanc notified his company by phone that he had been robbed and then walked (for approximately three minutes) to the company building.
At the cab company, Mr. LeBlanc was immediately met by a police officer, Officer Chambers. Mr. LeBlanc told Officer Chambers what had occurred and the locations involved in the incident. Officer Chambers transported Mr. LeBlanc to Lafayette Square. There, three men were lined up with a police officer standing beside them. Mr. LeBlanc observed the three men. He was asked by the police if any of these men were the men who had robbed him and he said: “No.”
Mr. LeBlanc then left Officer Chambers to go in another police car with Detective Burrill and another Haverhill police officer. For ten to fifteen minutes, Detective Burrill drove Mr. LeBlanc around an area of Haverhill where Detective Burrill believed that they would pass a number of Hispanic males. Mr. LeBlanc was told that if he saw any of the perpetrators he should notify the police of that fact. They passed about one hundred people on the street. Of the one hundred, approximately thirty to forty were Hispanic males. Each time the police car drove by a group of Hispanic males congregated at a street corner, the detective would either drive slowly or stop or almost stop the car in order for Mr. LeBlanc to look at the pedestrians. As they drove, the detective had his car’s lights on. The streets were also illuminated by street lights and business lights. Mr. LeBlanc did not identify any of the men whom they passed.
After approximately fifteen minutes, Detective Burrill received a radio message from Officer Chambers instructing him to drive down Emerson Street because there was someone to view at that location. One of the officers told Mr. LeBlanc that they had a man on Emerson Street whom they wanted him to see.
At that point, Detective Burrill drove Mr. LeBlanc down Emerson Street. This was approximately thirty minutes after the robbery had occurred. Mr. LeBlanc saw an individual on Emerson Street who was between the headlights of two cruisers. Mr. LeBlanc observed that this person had the same build, skin color and “the same-looking face” as that of the person who had been in his right front passenger seat. Mr. LeBlanc said that the individual on the street looked like the man in the front passenger seat, that he was pretty certain that was the man, but was not positive. He wanted to get out of the car and hear the man’s voice to be completely certain. The man on the street was wearing a jacket but it was not the red Chicago Bulls ski parka that had been worn by the man in the front seat. Mr. LeBlanc was concentrating on the face, however, rather than the clothing.
The police car pulled over. Detective Burrill got out and then permitted Mr. LeBlanc to get out. Mr. LeBlanc walked to about three feet of the individual being detained by the police on Emerson Street. The lighting was very good because the lights of the two cruisers, as well as the street lights at the corner of Emerson Street, shone on the individual.
One of the police asked the individual an inconsequential question. As soon as the individual began talking, Mr. LeBlanc recognized his voice and, “it clicked altogether.” Mr. LeBlanc was absolutely positive at that point that this was the man who had been in the front passenger seat and he indicated the same to Detective Burrill. The man whom Mr. LeBlanc had identified is the defendant Cesar Diaz.
In regard to the defendant’s contention that he was stopped and detained by the police without reasonable *535 and articulable suspicion, Cesar Diaz’s detention for this identification resulted from the following events. After Officer Chambers had spoken with Mr. LeBlanc about the details of the robbery and had left Mr. LeBlanc in the company of Detective Burrill and another Haverhill police officer, Officer Chambers began driving around the area in question. Officer Chambers had been a Haverhill police officer for thirteen years and is familiar with the streets of the city. While Officer Chambers followed the robbery route, he learned that Mr. LeBlanc’s taxicab had been found abandoned on Orchard Street. Officer Chambers also knew that the robbery episode had begun at 116 White Street (where Mr. LeBlanc picked up the three men) and that the cab had proceeded to Emerson Street, Orchard Street, Washington Street and then Duncan Street. (See Exhibit No. 1 attached.) At one point, Officer Chambers was on Welcome Street, the continuation of Orchard Street. From Welcome Street, he was able to observe the rear of a house at 134 Howe Street. The house at 134 Howe Street is one known to Officer Chambers as a house whose tenants had been involved in criminal activity. In fact, Officer Chambers had frequently been to that house on criminal investigations.
Officer Chambers considered the following factors. Number 116 White Street where the fare was originally picked up by Mr. LeBlanc is approximately two and one-half blocks from the house at 134 Howe Street. The location of Duncan Street where Mr. LeBlanc was forced out of his taxicab is approximately three to four blocks from 134 Howe Street. The place where the taxicab was found abandoned on Orchard Street is approximately one and one-half blocks from Howe Street, or approximately a three-minute walk from the house at 134 Howe Street. The entire area involved forms a horseshoe or semicircle around Howe Street (see Exhibit No. 1), that is, Howe Street is actually in the middle of all the locations involved.
In addition, Officer Chambers was aware that there is a so-called “paper street,” an alleyway that is perpendicular to Welcome Street and parallel to Emerson and Howe Streets. The paper street runs north from Welcome Street part of the way up to Winter Street.
While driving on Welcome Street, Officer Chambers noticed an individual coming out of the rear porch at 134 Howe Street at the same time that Officer Chambers saw a detective’s car proceeding up Howe Street. After the car passed 134 Howe Street, the individual on the porch looked around the house and then came down the stairs into the backyard. The individual went through the back area from Howe Street to Emerson Street. Officer Chambers has himself walked from Howe Street to Emerson Street through the back area when investigating activity in that area. The land there consists of brush, trees and a fence with a large hole a person can climb. There is also a wall to climb in order to exit from that back area onto Emerson Street. Officer Chambers proceeded up Emerson Street and saw the individual whom he had seen come out of the house at 134 Howe Street come out of the back area onto Emerson Street.
Officer Chambers saw the individual then cross Emerson Street and proceed north on Emerson. Officer Chambers recognized the individual as the defendant Cesar Diaz. The officer observed that Diaz met the description of one of the people involved in the taxicab armed robbery that had been reported to him minutes earlier. Diaz was tall, slim and between the ages of eighteen and twenty-five. He was wearing a heavy jacket which could have been the same as that worn by the front passenger in the robbery.
The officer yelled to Diaz: “Yo!” Diaz stopped and the officer asked him to come over. The officer got out of his cruiser and asked Diaz where he had been coming from. Diaz pointed up the street and said that he was coming from his girlfriend’s house. He pointed up Emerson Street north towards Winter Street and White Street. (See Exhibit No. 1.) This was the opposite direction from the path which the officer had just seen Diaz take. In fact, the officer had seen Diaz coming from an easterly direction, the house at 134 Howe Street, not from a northerly direction.
The officer told Diaz that he was seeking a party who fit Diaz’s description and proceeded to pat frisk Mr. Diaz. Nothing was found in the pat frisk. Officer Chambers radioed to the detectives to come to his location and he waited there with Mr. Diaz on Emerson Street for a few minutes for the detectives. Mr. Diaz repeated to Officer Chambers that he was just coming from his girlfriend’s house and that he had not done anything. The detectives then appeared with Mr. LeB-lanc. Mr. LeBlanc identified Diaz and Diaz was arrested.
The time that had elapsed between the moment that Officer Chambers stopped Mr. Diaz and the arrival of the detectives with the identifying witness was approximately two minutes.
RULINGS OF LAW
The burden is on the defendant to establish by a preponderance of the evidence that a given confrontation was so unnecessarily suggestive as to give rise to substantial likelihood of mistaken identification. Commonwealth v. Botelho, 369 Mass. 860, 867 (1976); Commonwealth v. Venios, 378 Mass. 24, 29 (1979).
The test is whether, in light of the “totality of the circumstances,” the identification procedure was unnecessarily suggestive of the defendant. Commonwealth v. Santos, 402 Mass. 775, 781 (1988). Although one-on-one confrontations are inherently suggestive, Commonwealth v. Powell, 10 Mass.App.Ct. 57, 60-61 (1980), “due process rights are not violated when police arrange a one-on-one confrontation between the victim and the suspect promptly after a criminal event occurs.” Commonwealth v. Williams, 399 Mass. 60, 67 (1987). The procedure is justified by the need for *536 efficient investigation in the immediate aftermath of crime and provides a good opportunity for accurate identification while the victim’s recollection or mental image of the defendant is still fresh. Id.
In this case the one-on-one confrontation and identification occurred within approximately thirty minutes following the robbery. The confrontation did not become impermissibly suggestive because the police told the identifying witness that they were going to look at someone on Emerson Street, nor did it become suggestive because the individual was placed between police cruisers with police in the area. Commonwealth v. Leaster, 395 Mass. 96, 103-04 (1985). ‘The witness knows he would not be asked to make an identification unless the police had reason to suspect the defendant’s involvement.” Commonwealth v. Hicks, 17 Mass.App.Ct. 574, 583 (1984); Commonwealth v. Perretti, 20 Mass.App.Ct. 36, 41-42 (1985).
The identification was made in this case approximately one-half hour after the incident. This is well within the periods of time that have been involved in other cases and held permissible. For example, see Commonwealth v. Leaster, supra, (one and one-half hours after the crime); Commonwealth v. Bumpus, 354 Mass. 494, 450 (1968) (one hour); and Commonwealth v. Coy, 10 Mass.App.Ct. 367, 370 (1980) (an hour to an hour and one-half).
Although the type of confrontation between Mr. LeBlanc and the defendant was different than that between Mr. LeBlanc and the other Hispanic males (except for those in Lafayette Square), under the totality of the circumstances, the one-on-one confrontation in this case was not impermissibly suggestive but, rather, expeditious and essential to an ongoing police investigation. Commonwealth v. Williams, supra. It is significant, although not essential, that the identifying witness had been taken to view another group of three Hispanic males who had been stopped by the police in Lafayette Square and that he did not identify any of these men.
There is no impropriety in allowing the victim to listen to the defendant’s voice as part of the identification process. This use of another means of identification assisted the process. The defendant in this case was involved in normal conversation with the police officer. He was not required to speak the words that had been spoken by the man in the front passenger seat during the crime. Commonwealth v. Gauthier, 21 Mass.App.Ct. 525, 528 (1988).
The defendant also argues that his stop and detention were not based upon reasonable and articulable suspicion on the part of the police officer. A brief stop of a suspicious individual in order to determine his identity may be reasonable in light of the facts known to the officer at the time. Terry v. Ohio, 392 U.S. 1 (1968). As indicated by the following factors, the police in this case had sufficient information to stop and detain the defendant in order to arrange for the witness to be brought to the scene for identification purposes. Officer Chambers observed that the individual who emerged from 134 Howe Street matched the description of a participant in a robbery which had occurred approximately thirty minutes earlier. See Commonwealth v. Salerno, 356 Mass. 642, 646-47 (1970). Officer Chambers saw the individual leaving a house which Officer Chambers recognized as a house frequented by people involved in criminal activity. See Commonwealth v. Moses, 408 Mass. 136, 140 (1990). Officer Chambers observed the individual looking around in an apparent attempt to determine if the police car had proceeded out of sight on Howe Street. See Commonwealth v. Wren, 391 Mass. 705, 708 n.2. Officer Chambers saw the individual traverse an area known to him to be a difficult area to navigate because of high brush, trees and weeds. The individual also had to maneuver a hole in a fence and scale a wall in order to come out onto Emerson Street. See Commonwealth v. Zdanowicz, 12 Mass.App.Ct. 231, 234 (1981).
In addition, Officer Chambers was aware from Mr. LeBlanc and from other officers of the locations that had been involved in the robbery. Officer Chambers knew that the three locations of White Street, Duncan Street and Orchard Street all circled around Howe Street. He was also cognizant of the fact that the place on Orchard Street where the cab had been abandoned was very close to 134 Howe Street. See Commonwealth v. Ling, 370 Mass. 238, 241 (1976). The original stop was justified and its length and extent were reasonable.
Once Mr. Diaz was stopped, his explanation of where he had been was inconsistent with Officer Chambers’s personal observation of the route he had just seen Mr. Diaz traversing. The increasing suspicion of the officer justified prolonging the stop and enlarging the scope of the threshold inquiry. Commonwealth v. Crowley, 29 Mass.App.Ct. 1 (1990). Officer Chambers detained the defendant for only about two minutes before the complaining witness Mr. LeBlanc was brought to the scene and was able to identify Mr. Diaz as the person in the front seat. The question is whether the intrusiveness of the seizure was proportional to the degree of suspicion that prompted the intrusion. Id. This Court concludes that it was.
In conclusion, the one-on-one confrontation was not impermissibly suggestive and the stop and detention of the defendant were based upon reasonable and articulable suspicion.
ORDER
For the foregoing reasons, the defendant’s motion to suppress the identification is DENIED.