Gants, J.
Defendants Edwin Calderon, Jr. and Michael McDonald have been indicted for the June 11, 1998 murder of Raymond Barbour and for other crimes related to that murder. Calderon now moves under Article XII of the Massachusetts Declaration of Rights to suppress both the out-of-court and anticipated in-court identifications of him by witnesses Attanya Mouradian and Trina Barrows. McDonald moves under Article XII to suppress both the out-of-court and anticipated in-court identifications of him by witness Trina Barrows. This Court held an eviden-tiary hearing on these motions on October 13 and 14, 1999. For the reasons stated below, the defendants’ motions to suppress are DENIED.
FINDINGS OF FACT
Based upon the credible testimony of the witnesses, the exhibits admitted into evidence at the suppression hearing, and reasonable inferences drawn from that evidence, I find the following facts. Since the defendants seek to suppress the identifications made by both Attanya Mouradian and Trina Barrows, and since these two women observed the defendants in wholly separate contexts, I shall find the facts as they relate to each of these witnesses.
I. Attanya Mouradian
At the time of the homicide, Attanya Mouradian was a 20 year old woman who resided in an apartment on the third floor of 45 Charlotte Street in Worcester with a roommate, Harry Nelson. On the evening of June 10, 1998, she and Nelson had a number of persons over at their apartment. Much beer was drunk, and bottles littered the floor, but Mouradian did not drink or take drugs that evening. At or around 2 a.m. on June 11, she was home alone, lying on the couch in her living room, talking on the telephone.
Unknown to her, Raymond Barbour, whose nickname was Bakim, entered her apartment in his wheelchair, along with the defendant Calderon and a masked, hooded third person she did not recognize. Calderon put a gun to her face and told her to give him all her jewelry and money. The third person pulled a gun from his waistband and threatened to blow her head off. Mouradian gave them all the rings on her fingers, her bracelet, and all her other jewelry. Barbour told Calderon and the third person not to hurt Mouradian, that she had nothing to do with it. Mouradian then went to her bedroom to get her money, which was in a shirt in her closet. Calderon and the third person followed her into the bedroom. She gave them the roughly $200 in cash that she had, then hid in the closet as Calderon and the third person removed much of her clothing from her closet. While in her bedroom, the mask worn by the third person dropped briefly and she saw part of his face for a brief moment.
Calderon and the third person then left her bedroom, but she remained in the closet. Moments later, she heard a gunshot and then heard Calderon and the third person leave her apartment. When she left her bedroom and entered the living room, she saw Barbour bleeding and immediately called 911. She implored the dispatcher to send the police immediately, saying that Barbour was dying. She also volunteered to the dispatcher that she knew who did it. The dispatcher told her the police were coming and repeatedly asked her who had done it. She finally answered, “Edward Calderon."
Mouradian was taken by ambulance to the hospital for evaluation. There, she spoke with a doctor, who tried to calm her but gave her no medication. She was then escorted by Detective Daniel Rosario of the Worcester Police Department to the police station at roughly 3 or 4 a.m. At the police station, she was interviewed alone by Detective Rosario about the robbery and shooting. During the interview, well after she had named Calderon as one of the two men who had invaded her home that morning and told the Detective that she knew Calderon, Detective Rosario showed her a single photograph and asked her if this was the same Edwin Calderon she had named. She said it was. After the interview, Detective Rosario asked Mouradian to look through an album of photographs, with photographs of men on each page, to see if she could locate a photograph of the masked third person. Calderon’s photograph was among these photographs; it is not *562 clear whether McDonald’s photograph was included. While reviewing the photographs, Mouradian pointed to a photograph of Miguel Torres and identified him as the third person. Later, the police made photocopies of Calderon’s photograph and asked her again if this was Calderon. She confirmed that it was.
Mouradian had known Calderon since she was in the eighth grade; he was one grade below her at the Sullivan Middle School in Worcester. When she went to South High Community School, he followed a year later and they were together in high school for three years, until Mouradian graduated in June 1996. Mouradian knew Calderon in school because he was popular and well known. She and her friends socialized somewhat with him and his friends in high school. She had not seen Calderon for a long time when she spotted him walking on Florence Street during the afternoon of June 10, 1998. She was a passenger in a car which stopped near him and he spoke briefly with her.
II. Tania Barrows
On June 10, 1998, Tania Barrows returned home around 6:30 p.m. from her job as a staff supervisor at D’Angelo’s. At around 10:30 that night, she was paged by the defendant Michael McDonald. Barrows had met McDonald roughly a week and a half earlier, through a mutual friend. She had seen him a few times before June 10, generally to drive him places at his request. Barrows called the return number on the page and McDonald asked her to pick him up at his home on Mill Street in Worcester. She drove her Chevy Blazer to the apartment complex on Mill Street and waited in the truck for him. He arrived, moved into the driver’s seat, and drove to the Lakeside apartment complex, where he spent roughly 15 minutes with Calderon (who Barrows knew only by his first name, Edwin) and others.
McDonald and Barrows then left together in her truck and drove to McDonald’s home on Mill Street. He left the truck and told Barrows he was going to get two 40 ounce beer bottles. Barrows drove home, then returned to McDonald’s residence and picked him up again. They returned to Lakeside, where McDonald again spent time with others, including Calderon and Rennie Colon.
Around 1:45 a.m., McDonald said he wanted to see a friend at the Great Brook apartment complex. He drove Barrows’ truck, with Barrows his only passenger, and a car with a number of persons who had been at Lakeside followed them. At Great Brook, McDonald pulled over and let the car pass them, and he followed it. Shortly thereafter, while still in Great Brook, both the car and McDonald’s truck stopped. Two persons from the car got out, and walked behind the truck to speak with McDonald. Barrows heard gunshots and then observed Rennie Colon point a gun in the air and fire a shot. McDonald returned to the wheel and drove away, but stopped to allow Calderon, who was running towards them, to enter the vehicle. Since the truck was only a two-door, Barrows had to move up her front passenger seat to allow Calderon to sit in the rear seat. Barrows heard a clicking sound in the back seat, and turned to see Calderon with a handgun.
At or around 2:30 a.m., they drove to Charlotte Street and parked on the street outside some apartment buildings. McDonald and Calderon left, saying they were going to the bathroom. McDonald returned alone shortly thereafter, and asked Barrows to promise to stay there, which she did. McDonald then walked away. Moments later, Barrows heard a gunshot. Within seconds, McDonald returned to the truck, with some clothing. About a minute later, Calderon returned to the truck, carrying clothing and videotapes, and they drove to Lakeside, where both Calderon and McDonald jumped out of the truck after they spotted a police car.
On June 12, 1998, after Barrows learned that a shooting had occurred on Charlotte Street when she sat outside in her truck, she retained a criminal defense attorney, who arranged for Barrows to give a statement to the Worcester police. At roughly 4 p.m., accompanied by her attorney, she met with Sgt. Leo Tivnan and Detective Faith Roche. She told them what had occurred on the evening and early morning of June 10-11, and identified Michael McDonald and “Edwin” as the persons who were with her in the truck on Charlotte Street. After she had named both McDonald and Edwin, the detectives gave her a photograph of McDonald and asked her if this is the Michael McDonald she knew. She said it was. They then gave her a photograph of Calderon and asked her if this was the Edwin Calderon she knew. She said it was.[1]
The evening and early morning of June 10-11 was the third time Barrows had seen Calderon and the most extensive contact she had with him. Both the other times occurred in the week and a half before June 10, after she had met McDonald. On both occasions, she saw Calderon briefly when she was dropping McDonald off or picking him up.
CONCLUSIONS OF LAW
The Supreme Judicial Court, in Commonwealth v. Johnson, interpreted the due process clause of Article XII of the Massachusetts Declaration of Rights to require what has become known as a “rule of per se exclusion” with respect to the admissibility of identification testimony obtained through unnecessarily suggestive procedures. 420 Mass. 458, 462-63 (1995). The Johnson Court declared:
The rule of per se exclusion, set forth in Commonwealth v. Botelho, [369 Mass. 860 (1976)] states that the defendant bears the burden of demonstrating, by a preponderance of the evidence, that the “witness was subjected by the State to a confrontation that was unnecessarily suggestive and thus offensive to due process.” Id. at 866. If this is established, then the prosecution is barred from *563 introducing that particular confrontation in evidence at trial. Id. As for other identifications the witness may have made of the defendant, “the prosecution is limited to introducing at trial only such identifications by the witness as are shown at the suppression hearing not to be the product of the suggestive confrontation — the later identifications, to be usable, must have an independent source.” Id. The prosecution must demonstrate the existence of an independent source by “clear and convincing evidence.” Id. at 868.
420 Mass. at 463. The Johnson Court specifically refused to join the United States Supreme Court and every state except New York in adopting what has become known as the “reliability test,” which permits the admission of an identification obtained through an unnecessarily suggestive procedure when that identification, under the totality of the circumstances, was nevertheless reliable. Id. at 464. See Manson v. Braithwaite, 432 U.S. 98 (1977). The Johnson Court concluded that the stricter rule of per se exclusion was necessary to protect against the risk of mistaken identifications, which it believed were the primary cause of erroneous convictions. 420 Mass. at 465.
In deciding whether a particular confrontation was unnecessarily suggestive, the court must consider the totality of the circumstances surrounding the identification. Id. at 463-64. In examining the admissibility of the out-of-court identifications in this case, this Court must ask two questions: (1) Was the identification, in view of the totality of the circumstances, so suggestive as to give rise to a very substantial likelihood of misidentification? and (2) If so, was the suggestive identification unnecessary under the circumstances? This Court will address the first question first, since it is dispositive of the motion.
While police should aspire to identification procedures that are perfectly non-suggestive, courts have recognized that they often fall short of that mark. An out-of-court identification need not be suppressed simply because the procedure is more suggestive than it could have been. See, e.g., Commonwealth v. Clark, 378 Mass. 392, 399-02 (1979) (photographic identification procedure in which defendant’s photograph was one of two snapshots in photospread with eleven mug shots is not impermissibly suggestive); Commonwealth v. Mobley, 369 Mass. 892, 895-97 (1976) (photographic identification procedure not impermissibly suggestive when defendant was only person in pho-tospread shown wearing a ski cap and the victim recalled that the robber wore a ski cap). Rather, the photographic identification procedure must be “so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.” Simmons v. United States, 390 U.S. 377, 384 (1968). See also Commonwealth v. Johnson, 420 Mass. at 465 (identification should not be admitted into evidence “where the conditions are shown to have been highly and unnecessarily suggestive”), quoting Commonwealth v. Marini, 375 Mass. 510, 519 (1978); Commonwealth v. Botelho, 369 Mass. at 866 (out-of-court identification is inadmissible when “the witness was subjected by the State to a confrontation that was unnecessarily subjective and thus offensive to due process”).
Courts routinely disfavor one-on-one confrontations, whether of a photograph or of a person, but there is no per se rule of exclusion. Commonwealth v. Jackson, 377 Mass. 319, 332 (1979); Commonwealth v. Venios, 378 Mass. 24, 29 (1979). Certainly, to cite an extreme example, when a victim of domestic abuse is shown a photograph of her husband and asked whether this is the man who beat her, it would be preposterous to contend that showing this single photograph is so impermissibly suggestive as to give rise to a veiy substantial likelihood of misidentification. The reason is that, since she has seen her husband so often and knows him so well, there is no risk that the suggestion implicit in showing her the single photograph in any way materially affected her memory of her attacker. On the other extreme, when a victim is attacked by a stranger whom she was able to see only with a fleeting glance, showing her a single photograph would indeed be so suggestive as to give rise to a very substantial likelihood of misidentification. Since she was able to form only an imperfect memory of her attacker in her mind’s eye, there is a substantial risk that, when the police show her a single photograph under circumstances that imply the police think the person in the photograph may have been the attacker, she may erroneously identify that person as her attacker if he shares the few physical characteristics that she was able to observe and recall. In addition, her memory of her attacker may now forever be tainted, since she may confuse in her mind’s eye her memory of the photograph with her vague memory of the event. The challenge then, under the “rule of per se exclusion” adopted by Massachusetts, is to determine how familiar a witness must be with the accused for an otherwise suggestive identification procedure not to be suggestive under the circumstances.
This familiarity analysis is not needed in federal court or in any state court outside Massachusetts and New York, since all these courts adopt the “reliability test,” which permits the admission of an identification obtained through an unnecessarily suggestive procedure when that identification, under the totality of the circumstances, was nevertheless reliable. See Commonwealth v. Johnson, 420 Mass. at 464. These courts may consider the witness’s familiarity with the accused in evaluating the reliability of the out-of-court identification under the totality of circumstances. Under the “rule of per se exclusion” adopted in Massachusetts and New York, that reliability analysis may not be done, at least in determining the admission of out-of-court identifications, because even a reliable identification is inadmissible if the identification pro *564 cedure was highly suggestive. Therefore, it is not at all surprising that New York courts have grappled with this issue and developed a familiarity analysis, which they refer to as the “known to one another” or “confirmatory identification” exception. See People v. Rodriquez, 79 N.Y.S.2d 445, 593 N.E.2d 268 (Ct.App. 1992); People v. Collins, 469 N.Y.S.2d 65, 456 N.E.2d 1188 (Ct.App. 1983); People v. Lathrop, 242 A.D.2d 876, 662 N.Y.S.2d 962 (S.Ct.App.Div. 1997).
Under New York law, a defendant is not even entitled to a hearing on a motion to suppress identification testimony where the identification is of a family member, friend, or acquaintance because “the witness is so familiar with the defendant that there is ‘little or no risk’ that police suggestion could lead to a misidenti-fication.” People v. Rodriquez, 79 N.Y.S.2d at 450. See also People v. Collins, 60 N.Y.S.2d at 68. When a hearing is denied, “it is a ruling that however suggestive or unfair the identification procedure might be, there is virtually no possibility that the witness could misidentify the defendant.” People v. Rodriquez, 79 N.Y.S.2d at 450. When the witness’s prior familiarity with the defendant is something less than that of a family member, friend, or acquaintance, the Court must hold an identification hearing to explore the extent of the witness’s prior familiarity with the defendant and determine whether the identification could be influenced by suggestiveness or was “merely confirmatory.” Id. at 450-51. “At a hearing, the court might consider factors such as the number of times [the witness] viewed [the] defendant prior to the crime, the duration and nature of the encounters, the setting, the period of time over which the viewings occurred, the time elapsed between the crime and the previous viewings, and whether the two had any conversations.” Id. at 451.
In this case, the issue is not whether the defendants are entitled to a hearing on their motions to suppress identification testimony but whether, having received that evidentiary hearing, the evidence demonstrates that the witnesses were so familiar with the defendants that an otherwise suggestive identification procedure was not suggestive under the totality of the circumstances. This Court finds New York law to be informative in conducting this analysis, especially since neither party has cited any Massachusetts case that addresses this issue.[2]
This Court concludes that Attanya Mouradian was so familiar with Edwin Calderon that the otherwise suggestive showing of one photograph to her was not suggestive under the totality of the circumstances. Mouradian had known Calderon throughout both middle school and high school, and she had graduated from high school only two years before Barbour’s homicide. She had seen him on the street on June 10, 1998, only a few hours before the homicide, and spoke to him at that time. Having known him for years and seen him recently, Mouradian’s identification of Calderon could not have been influenced by being shown a single photograph of him. As a result, under the circumstances present here, the photographic identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.
This Court further finds that Tania Barrows was so familiar with Michael McDonald that the otherwise suggestive showing of one photograph to her was not suggestive under the totality of the circumstances. Although Barrows had not known McDonald for very long, she had spent a substantial amount of time with him over the week and a half prior to June 10, 1998, driving with him and hanging out with McDonald’s friends. On the night of the homicide, she had been with McDonald for nearly four hours. In view of the intensity of Barrows’ recent involvement with McDonald, it is somewhat silly to think that her identification of McDonald could have been influenced by being shown a single photograph of him. As a result, under the circumstances present here, the photographic identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.
Barrows’ identification of Edwin Calderon poses the closest question under this analysis. After careful review, this Court finds that Barrows was sufficiently familiar with Calderon that the otherwise suggestive showing of one photograph to her was not suggestive under the totality of the circumstances. Barrows had seen Calderon on two previous occasions before June 10 when she dropped McDonald off in her truck. She knew his first name. On the evening of June 10 and the early morning of June 11, she saw Calderon hanging out with McDonald at the Lakeside apartment complex on two separate occasions lasting roughly half an hour. Later, after they went to Great Brook, she saw him running towards her truck, opened the passenger side door to let him in, and saw him in her back seat as they drove to Charlotte Street. While there, she watched as he left her truck to enter an apartment house on Charlotte Street and watched as he returned, laden with someone’s clothing and videotapes. Calderon remained in her truck until they drove to Lakeside, when he and McDonald ran away after spotting a police car.
In Rodriquez, the New York Court of Appeals recognized that a witness who testified that he had seen the defendant “ ‘a few times’ prior to the crime as one of the ‘guys from the block’ who ‘mingled with the fellows’ ” may be found by a court after an evidentiary hearing to know the defendant so well that he was “impervious to police suggestion.” 79 N.Y.2d at 448 and 451-52. Barrows, too, had seen Calderon a few times prior to the homicide as someone who hung out with McDonald and she knew him well enough to know his first name. She also had an opportunity to see him in and around her truck on the night of the homicide, *565 under circumstances that drew her attention directly to him. Considering the factors set forth in Rodriquez, supra at 451, along with all the other circumstances, Barrows’ identification of Calderon could not have been significantly influenced by being shown a single photograph of him. As a result, under the circumstances present here, the photographic identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of misidenti-fication.
Having found that, under these circumstances, the photographic identification procedures were not so suggestive as to give rise to a very substantial likelihood of misidentification, this Court need not decide whether these procedures were unnecessary, since both the out-of-court and in-court identifications are admissible regardless. Similarly, having so found, this Court need not consider whether the anticipated in-court identifications have an independent source. See Commonwealth v. Miles, 420 Mass. 67, 77-78 & n. 9 (1995).
ORDER
For the reasons stated above, the defendant Calderon’s motion to suppress both the out-of-court and anticipated in-court identifications of him by witnesses Attanya Mouradian and Trina Barrows is DENIED. The defendant McDonald’s motion to suppress both the out-of-court and anticipated in-court identifications of him by witness Trina Barrows is also DENIED.

 This was the first time that Barrows learned that Calderon was Edwin’s last name.

 While Massachusetts cases appear not to have confronted this particular issue, it is noteworthy that, under Massachusetts law, a judge at trial need not instruct the jury on the possibility of a good faith error in a witness’s identification when “the parties are so well known to each other or so closely related that under sufficient lighting and with appropriate physical proximity, the identification by the victim is either true or the victim is lying.” Commonwealth v. Pressley, 390 Mass. 617, 619 (1983). See also Commonwealth v. Stoddard, 38 Mass.App.Ct. 45, 48 (1995) (no good faith error instruction required when witness knew the defendant as a regular customer of his self-service gas station). Having recognized that a witness may know the defendant so well that there is no risk of a good faith misidentification, this Court is confident that the Supreme Judicial Court would also recognize that a witness may know the defendant so well that there is no risk that a suggestive identification procedure would influence that identification.