Gants, J.
The defendant Michael Muller has moved to suppress the identification of him by the alleged victim, the statements made by his girlfriend when the police entered the home in which he resided, the dismantled handgun that was found in a garbage bag outside that home, and the statements he made to the police following his arrest. On September 28, 2004, following an earlier evidentiary hearing, this Court held that the arrest warrant for the defendant was void and invalid as a matter of Massachusetts constitutional law because the Assistant Clerk had failed to sign the warrant. See Findings of Fact, Conclusions of Law, and Order as to Defendant’s Motion to Declare Unlawful the Arrest Warrant in the Malden District Court (“the September 28, 2004 Decision”) [18 Mass. L. Rptr. 483]. That same day, this Court conducted a *497second evidentiary hearing to determine whether the handgun and prior statements must be suppressed because of that ruling, and to decide the admissibility of the identification. At that second evidentiary hearing, four witnesses testified: Detective James Cameron of the Melrose Police Department (“Detective Cameron”), Melrose Police Sargent Barry Campbell (“Sgt. Campbell”), Melrose Police Officer Danab Shea (“Officer Shea”), and Melrose Police Officer David Roy (“Officer Roy”). For the reasons detailed below, the defendant’s motion to suppress is DENIED.
FINDINGS OF FACT
This Court adopts and incorporates by reference the findings of fact made earlier following the evidentiary hearing as to the lawfulness of the arrest warrant, and simply supplements those findings with these below. See Findings of Fact, Conclusions of Law, and Order as to Defendant’s Motion to Declare Unlawful the Arrest Warrant in the Malden District Court, September 28, 2004.
On March 4, 2004, at roughly 10:40 p.m., a black male entered the Richdale convenience store at 54 West Wyoming Avenue in Melrose, approached the counter where store clerk Emran Chowdhury (“Chowdhuiy”) was working, lifted his sweatshirt to reveal a silver handgun, placed the handgun on the counter, and demanded $100, which Chowdhuiy gave to him. When interviewed shortly after the robbery, Chowdhuiy described the robber as roughly 25 years old, wearing dark clothing, with long hair and a beard. Chowdhuiy also said that he recognized the robber, because the robber had been in the store “about two times” before to purchase cigarettes, accompanied by a heavy white woman with dark hair who was not with him on the night of the robbery.
The defendant became a suspect in the robbeiy as the result of information obtained by Detective Cameron from a confidential informant. Detective Cameron learned that the defendant had previously been arrested by the Saugus Police Department under the name of Shawn Miller, and, during that booking, gave a date of birth of November 6,1972 and Social Security number 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. Detective Cameron ran this name and identifying information through the Warrant Management System, and the records of both the Registry of Motor Vehicles (“RMV”) and the Board of Probation (“BOP"). From these record checks, Detective Cameron learned that there were two active default warrants outstanding against Shawn Miller, one for operating after suspension out of Cambridge District Court and a second for compulsory insurance violation out of Lynn District Court. He also learned that, according to BOP records, Shawn Miller’s true name was Michael Muller.
Sgt. Campbell prepared the photograph array to show to Chowdhuiy. He obtained the booking photograph of the defendant from the Saugus Police Department, as well as ten photographs of black males provided by that Department. He chose five photographs provided by the Saugus Police Department, plus the defendant’s photograph, and added two booking photographs of black males that had been taken by the Melrose Police Department. He chose one of the Melrose photographs because the male had braids, comparable to those shown in the defendant’s photograph, and another had a beard similar to that shown in the defendant’s photograph. He redacted the photographs so that they did not appear to be taken during booking and placed them on a sheet of paper. On the back of the paper, he added a stamped statement which read:
You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not obligated to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses nor indicate in any way that you have identified someone.
Chowdhuiy came to the Melrose police station to look at the photospread on March 17, 2004 at 11 a.m. He read the above stamped statement and signed it below. Sgt. Campbell, before he turned the photospread over to reveal the photographs, told Chowdhury that he should look the photographs over and tell him if anyone looked familiar. Chowdhuiy looked at the photographs for about a minute and declared, “I found the guy.” Sgt. Campbell asked him whom he had found, and Chowdhuiy said that this was the man who robbed him. He pointed to photograph 7 — the photograph of the defendant. Sgt. Campbell asked if he was sure, and Chowdhuiy said that he was positive.
Based on this identification and other information, Detective Cameron on March 17, 2004 applied for and obtained a warrant for the defendant’s arrest for armed robbeiy, assault with a dangerous weapon, and possession of a firearm by a felon. As discussed at length in the findings of fact regarding the lawfulness of that arrest warrant, Assistant Clerk James Boyle found probable cause to arrest and authorized the issuance of an arrest warrant, but never signed the warrant that was ultimately issued, thereby rendering the arrest warrant null and void. Detective Cameron, however, reasonably believed he had a valid warrant for the defendant’s arrest on these crimes and, with five fellow officers, went to 61 Lynde Street in Melrose, where the defendant resided, to arrest the defendant on the warrant.
Before going to that address on March 17, 2004, the police learned that it was a single-family residence owned by Mr. and Ms. Murphy, who lived there with their daughter Kristen, her boyfriend (the defendant), and Kristen’s young children. Sgt. Campbell walked *498up the steps to the side door of the house and was about to ring the doorbell when he saw a car arrive in the driveway. Mr. Murphy’s son (Paul Murphy), who appeared to be in his mid-thirties and who the police later learned also resided at 61 Lynde Street, walked out of the car and Sgt. Campbell spoke with him. Sgt. Campbell explained that he was a police officer, that he had a warrant for the arrest of Michael Muller for armed robbery, and that there may be a gun in the house. Paul Murphy asked for a few minutes and entered the house, leaving Sgt. Campbell outside on the side door steps. He returned a few minutes later, and told Sgt. Campbell that the two children were in the basement with their grandfather, and the defendant was in an upstairs room with Murphy’s sister. Sgt. Campbell motioned for the other five officers to come to the door, and the six Melrose officers entered the side door that had been opened by Paul Murphy.
Once the police had entered, Paul Murphy pointed to the upstairs room where the defendant could be found. The door of this bedroom was slightly ajar. The six police officers waited outside the room for a moment, and heard the voices of two persons conversing. Detective Cameron then kicked the bedroom door open and the police officers quickly entered with guns drawn to take the defendant into custody. The defendant, who had been laying on the bed with Kristen Murphy, was placed in handcuffs, told he was under arrest for armed robbery, read his Miranda rights, and taken outside to a waiting patrol car for booking at the police station. Inside the bedroom, the officers observed burnt pieces that appeared to be from smoking crack cocaine, marijuana seeds, and pipes that could be used to smoke crack cocaine.
After the defendant was brought outside, Officer Shea spoke with Kristen Murphy. He told her why they were there — that her boyfriend had been arrested for armed robbery and that a gun had been used in the robbery. He asked her what she knew about the gun. Kristen Murphy initially denied any knowledge and then admitted that the defendant had just thrown a gun out. Officer Shea asked where he had thrown the gun, and Kristen said it was in a trash bag left outside the house. Officer Shea walked outside the house and found two large green trash bags on the driveway, right below the steps leading to the side door. He opened the bags and emptied the contents onto the driveway. In the trash contained in one bag, he found two rounds of ammunition and the dismantled parts of a .25 caliber semi-automatic pistol. Sgt. Campbell then went to the basement of the house, where he found the senior Murphy with his two grandchildren, who appeared to be roughly four to six years in age. He told him that they had arrested the defendant and found the gun, and thanked him for his cooperation.
Back at the station, Detective Cameron entered the booking area to inform the booking officer of the criminal charges that were being lodged against the defendant. While Detective Cameron was trying to speak with the booking officer, the defendant was loudly complaining that his arrest was unfair, that he did not do anything, and that the police were violating his rights. He asked rhetorically why they were doing this to him. Detective Cameron turned to the defendant and told him that they had found the gun. The defendant responded, “I don’t have no gun. If I did, there would have been a shootout.” The defendant, although boisterously complaining about his arrest, did not appear to be under the influence of drugs or alcohol.
CONCLUSIONS OF LAW
The defendant has moved to suppress (1) the identification of him by Chowdhuiy from the photospread; (2) the statements made by Kristen Murphy about the gun following the defendant’s arrest; (3) the dismantled handgun that was found in a garbage bag outside the home in which he resided with the Murphys; and (4) the statements he made to the police at the police station following his arrest. This Court will consider each of the defendant’s four claims of suppression in turn.
1. The Motion to Suppress the Out-of-Court Identification by Chowdhuiy
The Supreme Judicial Court, in Commonwealth u. Johnson,, interpreted the due process clause of art. 12 of the Massachusetts Declaration of Rights to require what has become known as a “rule of per se exclusion” with respect to the admissibility of identification testimony obtained through unnecessarily suggestive procedures. 420 Mass. 458, 462-63 (1995). The Johnson Court declared:
The rule of per se exclusion, set forth in Commonwealth v. Botelho, [369 Mass. 860 (1976)] states that the defendant bears the burden of demonstrating, by a preponderance of the evidence, that the “witness was subjected by the State to a confrontation that was unnecessarily suggestive and thus offensive to due process.” Id. at 866. If this is established, then the prosecution is barred from introducing that particular confrontation in evidence at trial. Id. As for other identifications the witness may have made of the defendant, “the prosecution is limited to introducing at trial only such identifications by the witness as are shown at the suppression hearing not to be the product of the suggestive confrontation — the later identifications, to be usable, must have an independent source.” Id. The prosecution must demonstrate the existence of an independent source by “clear and convincing evidence.” Id. at 868.
420 Mass, at 463. The Johnson Court specifically refused to join the United States Supreme Court and every state except New York in adopting what has become known as the “reliability test," which permits the admission of an identification obtained through an unnecessarily suggestive procedure when that identi*499fication, under the totality of the circumstances, was nevertheless reliable. Id. at 464. See Manson v. Braithwaite, 432 U.S. 98 (1977). The Johnson Court concluded that the stricter rule of per se exclusion was necessary to protect against the risk of mistaken identifications, which it believed were the primary cause of erroneous convictions. 420 Mass, at 465.
In deciding whether a particular confrontation was unnecessarily suggestive, the court must consider the totality of the circumstances surrounding the identification. Id. at 463-64. Consequently, in examining the admissibility of the out-of-court identifications in this case, this Court must ask two questions: (1) Was the identification, in view of the totality of the circumstances, so suggestive as to give rise to a very substantial likelihood of misidentification? and (2) If so, was the suggestive identification unnecessary under the circumstances?
While police should aspire to identification procedures that are perfectly non-suggestive, courts have recognized that they often fall short of that mark. An out-of-court identification need not be suppressed simply because the procedure is more suggestive than it could have been. See, e.g., Commonwealth v. Clark, 378 Mass. 392, 399-402 (1979) (photographic identification procedure in which defendant’s photograph was one of two snapshots in photospread with eleven mug shots is not impermissibly suggestive); Commonwealth v. Mobley, 369 Mass. 892, 895-97 (1976) (photographic identification procedure not impermissibly suggestive when defendant was only person in photospread shown wearing a ski cap and the victim recalled that the robber wore a ski cap). Rather, to be suppressed, the identification procedure must be “so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.” Simmons v. United States, 390 U.S. 377, 384 (1968). See also Commonwealth v. Johnson, 420 Mass, at 465 (identification should not be admitted into evidence “where the conditions are shown to have been highly and unnecessarily suggestive”), quoting Commonwealth v. Marini, 375 Mass. 510, 519 (1978); Commonwealth v. Botelho, 369 Mass, at 866 (out-of-court identification is inadmissible when “the witness was subjected by the State to a confrontation that was unnecessarily subjective and thus offensive to due process”).
This Court does not find the photospread shown to Chowdhury, in view of the totality of the circumstances, to be so suggestive as to give rise to a very substantial likelihood of misidentification. All eight of the photographs were of black males that appeared to be in their twenties or early thirties. While only the defendant had beaded braids in the photograph, another photograph showed a black male with braids. Moreover, Chowdhury did not identify the robbery as having braided hair or beaded, braided hair; he simply said he had long hair. The defendant had a beard in the photograph, but so did at least two (maybe three) other males in the photographs (it is hard to tell from the copies of the photographs offered at trial). Therefore, this Court does not find that the selection of the photographs suggested that the defendant was the robber. Nor was the procedure suggestive. While the better practice is to show one photograph at a time, Chowdhury did read and sign the advice printed behind the photographs before he saw any of them, which emphasized that the robber may not be among those in the photospread. Finally, this Court notes that the robber was not a complete stranger to Chowdhury, since he had seen him in the store at least twice before the robbery. For all these reasons, the defendant’s concerns about the photographic identification go to weight, not admissibility. His motion to suppress Chowdhury’s identification, therefore, is DENIED.
2. The Motion to Suppress the Statements of Kristen Murphy
The defendant contends that the police entry into 61 Lynde Street was unlawful because it was based on an invalid arrest warrant and that the statements made by Kristen Murphy in her bedroom shortly after the defendant’s arrest was the “poisonous fruit” of that illegal entry. This Court will first consider whether the police entry was unlawful.
a. Was the Entry Unlawful?
This Court has previously ruled “that the failure of the clerk here to sign the arrest warrant of the defendant means, as a matter of Massachusetts constitutional law, that the arrest warrant is void and invalid.” September 28, 2004 Decision, at 14. The Commonwealth, however, contends that the police entry into 61 Lynde Street to arrest the defendant was lawful even without a valid arrest warrant, and has provided three arguments in support of this contention.
First, the Commonwealth contends that the defendant has no standing to complain about the entry into 61 Lynde Street. The Commonwealth is correct that the defendant does not have “automatic standing” to complain about the seizure of the firearm, since automatic standing is limited to those motions to suppress “(w]hen a defendant is charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt.” Commonwealth v. Amendola, 406 Mass. 592, 601 (1990) (emphasis added). Here, the Commonwealth has not indicted the defendant for illegal possession of the firearm at the time of the search. While it has indicted him for assault by means of a dangerous weapon, in violation of G.L.c. 265, §14, which has an essential element that the assault was committed with a firearm, that offense is alleged to have been committed on March 4, 2004, when the Richdale convenience store robbery took place, not “at the time of the contested search” on March 17, 2004.
*500The defendant, however, does not need “automatic standing” to challenge the police entry into 61 Lynde Street, since he has traditional standing derived from his residing there with Kristen Murphy. Under both federal and Massachusetts constitutional law, even an overnight guest has standing to challenge the search of the premises in which he temporarily resided. Minnesota v. Olson, 495 U.S. 91, 95-96 (1990); Commonwealth v. Morrison, 429 Mass. 511, 513 (1999). Here, there is substantial evidence in the suppression hearing record to support the finding that the defendant was more than an overnight guest — a confidential informant told the police he was living at 61 Lynde Street and the postman told the police that he had delivered mail to the defendant at that address. Indeed, it was precisely this information that caused the police to identify the defendant’s address in the application for an arrest warrant as 61 Lynde' Street. Therefore, this Court finds that the defendant has standing to challenge the police entry into 61 Lynde Street.
Second, the Commonwealth argues that there were exigent circumstances that justified the warrantless entry into 61 Lynde Street to arrest the defendant. The burden of proving that exigent circumstances justified a warrantless entry into this residence rests with the Commonwealth. Commonwealth v. Forde, 367 Mass. 798, 806 (1975).
Factors which would have tended to support a finding of exigency include a showing that the crime was one of violence or that the suspect was armed, a clear demonstration of probable cause, strong reason to believe that the suspect was in the dwelling, and a likelihood that the suspect would escape if not apprehended. Additional considerations testing the reasonableness of police conduct are whether the entry is peaceable and whether the entry is in the nighttime.
Id. at 807. Generally, in evaluating whether the Commonwealth has met its burden of proving exigent circumstances, a Court, viewing the totality of the circumstances, considers the practicability of obtaining an arrest warrant and the risks posed by delaying the entry to obtain that warrant, and decides whether there was “sufficient justification for the failure to obtain a warrant.” Id. at 800-01, 806-07. Here, it was plainly practicable to obtain an arrest warrant because Detective Cameron applied for such a warrant and obtained judicial approval of that warrant, albeit without the required signature. The risks posed from the delay inherent in obtaining an arrest warrant were not appreciable here. There was no imminent risk of flight by the defendant, since he would not have known of Chowdhuiy’s identification of him as the convenience store robber. While there was good reason to believe the defendant was armed, there was no reason to believe he would be likely to commit another crime of violence in the time needed to obtain an arrest warrant. Plainly, under these circumstances, Detective Cameron, as he understood, would not have been justified in going directly to 61 Lynde Street to arrest the defendant without a warrant. Therefore, this Court finds that the Commonwealth has failed to satisfy its burden of proving that exigent circumstances would have justified the failure to obtain an arrest warrant here.
Third, the Commonwealth contends that the police were given consent to enter 61 Lynde Street by Paul Murphy, so the absence of an arrest warrant is of no consequence. There is no evidence, however, that Sgt. Campbell, when he spoke with Paul Murphy before entering 61 Lynde Street, ever asked for Paul Murphy’s consent. He simply explained that he was a police officer, that he had a warrant for the defendant’s arrest for armed robbery, and that there may be a gun in the house. Nor can Paul Murphy’s later conduct— asking for a few minutes, then returning to the door and explaining that the two children were in the basement with their grandfather and that the defendant was in an upstairs bedroom with Murphy’s sister — be characterized as granting consent. Rather, it was nothing more than “acquiescence to a claim of lawful authority,” which is not sufficient to constitute voluntary consent. See, e.g., Commonwealth v. Walker, 370 Mass. 548, 555 (1976). Therefore, this Court does not find that the entry into 61 Lynde Street was justified by consent. Since the arrest warrant on which the police relied was invalid because it was never signed, and the entry into 61 Lynde Street was not otherwise justified by exigency or consent, this Court finds that the police entry into that residence was unlawful.1
b. Does the Unlawful Entry Require the Suppression of Kristen Murphy’s Statement?
Under the fruits of the poisonous tree doctrine articulated by the Supreme Judicial Court, “(t]he pen-ally for an unlawful arrest in a defendant’s dwelling is the suppression of anything seized at the time of the arrest, either from the defendant or in the dwelling, and any statements made at the time of the arrest.” Commonwealth v. Marquez, 434 Mass. 370, 378 (2001). However, in Marquez, the unlawful entry constituted a violation of the Fourth Amendment to the United States Constitution, and the statements at issue were made by the defendant himself. Id. at 373-79. Here, this Court must consider whether suppression is the appropriate penalty when the unlawful entry violated art. 14 of the Massachusetts Declaration of Rights but not the Fourth Amendment, and when the statement is not made by the defendant but rather by a person present at the defendant’s arrest.
i. Is Suppression Appropriate for an Article 14 Violation that is Not a Fourth Amendment Violation?
In this Court’s September 28, 2004 Decision, I found that the arrest warrant here is void and invalid *501under art. 14 of the Massachusetts Declaration of Rights, not the Fourth Amendment of the United States Constitution. See September 28, 2004 Decision. The Supreme Judicial Court “has never accepted the concept of an exclusionary rule under the State Constitution when a search violated the requirements of art. 14 of the Declaration of Rights.” Commonwealth v. Sheppard, 394 Mass. 381, 391 (1985), quoting Commonwealth v. Upton, 394 Mass. 363, 365 (1985). “(T]he mere fact that an unlawful search and seizure has occurred should not automatically result in the exclusion of any illegally seized evidence.” Commonwealth v. Censullo, 40 Mass.App.Ct. 65, 69 (1996), quoting Commonwealth v. Gomes, 408 Mass. 43, 46 (1990). “Because art. 14 includes no specific requirement of exclusion, we have before us a question, not of right, but of remedy.” Commonwealth v. Sheppard, 394 Mass, at 391.
“In determining whether to exclude the evidence the court will examine ‘(1) the degree to which the violation undermined the principles underlying the governing rule of law . . . and (2) the extent to which exclusion will tend to deter such violations from being repeated in the future . . .’ ” Commonwealth v. Censullo, 40 Mass.App.Ct. at 69, quoting Commonwealth v. Gomes, 408 Mass, at 46. See also Commonwealth v. Grimshaw, 413 Mass. 73, 77 (1992).
Here, as to the first factor, the failure of the Assistant Clerk to sign the arrest warrant did not undermine the principles underlying the governing rule of law that an arrest warrant should be reviewed and issued by an independent judicial officer. As discussed in the September 28, 2004 Decision, the application for an arrest warrant here was reviewed by the Assistant Clerk and he specifically approved the issuance of the arrest warrant. The problem was the failure of the Malden District Court to return that arrest warrant to him for his signature once it had been prepared by clerical staff. Generally, technical or minimal violations of art. 14 do not undermine the principles underlying the governing rule of law and do not justify the exclusion of evidence. See Commonwealth v. Sheppard, 394 Mass, at 390-91; Commonwealth v. Sbordone, 424 Mass. 802, 811 (1997) (“minimal incremental intrusion on the defendant’s privacy” does not require exclusion); Commonwealth v. DiGeronimo, 38 Mass.App.Ct. 714, 729 (1995) (“mere technical violation" of art. 14 does not require exclusion). In Sheppard, the search warrant failed to meet the particularity requirements of art. 14 because the affiant failed in the search warrant to specify the items to be searched for that were specified in his affidavit. Commonwealth v. Sheppard, 394 Mass, at 384, 386. As here, there was no deficiency as to probable cause. Id. at 388. Also as here, there was no doubt that the judge who approved the warrant understood that the warrant was in accord with the affiant’s affidavit; the problem was the failure of the warrant itself to demonstrate on its face the limitations on the officers’ authority. Id. at 389. Here, as in Sheppard, the entry into the home “was conducted as if the warrant had complied with constitutional and statutory requirements.” Id. at 391. For all these reasons, here, as in Sheppard, “(d]espite the technical violation of art. 14, the search was not ‘unreasonable’ within the meaning of that constitutional provision.” Id.
As to the second factor, the failure to issue a signed, paper copy of the warrant was not the result of police action, but was a decision made by the Assistant Clerk pursuant to the standard procedures of the Malden District Court. Exclusion is a remedy designed to address misconduct by law enforcement, not court personnel. Arizona v. Evans, 514 U.S. 1, 46-47 (1995) (noting that “the exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees”). Because the failure to issue a signed, paper warrant was the decision of court personnel and not law enforcement personnel, exclusion in this case is unlikely to deter such violations from being repeated in the future. See Commonwealth v. Wilkerson, 436 Mass. 137, 140 (2002). Consequently, based on the two relevant factors, here, as in Sheppard, exclusion of the evidence obtained from the illegal entry, including Kristen Murphy’s statement to the police, is not required. See Commonwealth v. Sheppard, 394 Mass, at 391-92; Commonwealth v. Grimshaw, 413 Mass, at 77-80.2
ii. Is Suppression Appropriate for a Witness’s Statement Made at the Time of an Unlawful Arrest?
Even if the unlawful entry had arisen from a Fourth Amendment violation, this Court finds that the statement of a witness, like Kristen Murphy, made at the time of the airest is not a fruit of the poisonous tree that must be suppressed. “Evidence obtained subsequent to unlawful police conduct does not automatically become sacred and inaccessible.” Commonwealth v. Fredette, 396 Mass. 455, 459 (1985). Instead, such evidence may still be introduced if the Commonwealth can show that the challenged evidence has not been obtained by exploiting the illegality. Commonwealth v. Johnson, 58 Mass.App.Ct. 12, 14 (2003). See generally Brown v. Illinois, 422 U.S. 590, 603-04 (1975). “The United States Supreme Court has determined that evidence need not be excluded under the fruit of the poisonous tree doctrine ... if the government obtained the evidence through an independent source, ... if the connection between the improper conduct and the derivative evidence has become so attenuated as to dissipate the taint, ... or if the government can demonstrate that the evidence inevitably would have been discovered by lawful means.” Commonwealth v. Fredette, 396 Mass, at 459. “In determining whether the connection between the evidence and the improper conduct has become so attenuated as to dissipate the taint, the facts of each *502case must be examined in light of three factors: the temporal proximity of the arrest to the obtaining of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the misconduct.” Id. at 460, citing Brown v. Illinois, 422 U.S. at 603-04. See also Commonwealth v. Johnson, 58 Mass.App.Ct. at 14. “Often the most important factor considered relevant is the purpose and flagrancy of the official misconduct.” Commonwealth v. Johnson, 58 Mass.App.Ct. at 15.
In Johnson, the defendant was illegally stopped by a police officer and, during the police stop, a witness approached the officers, said that she had just had a chain snatched from her neck, and identified the defendant as the chain snatcher. 58 Mass.App.Ct. at 12. The Appeals Court did not suppress her identification even though the identification followed closely upon the stop, finding that “the fortuitous appearance of the complainant and her identification of the defendant at the cruiser was an independent intervening circumstance neither sought nor procured by the police” and that there was no purposeful or flagrant misconduct. Id. at 14-15. Here, as in Johnson, there was temporal proximity of the arrest to the statement made by Kristen Murphy, but her presence in the room with the defendant was neither sought nor procured by the police, and there was no purposeful or flagrant misconduct. Consequently, here, as in Johnson, the statement of Kristen Murphy cannot be said to have been obtained by exploiting the illegal entry, and therefore need not be suppressed as a result of the illegal entry.
Viewing less formalistically, “the ‘target’ of the exclusionary rule ‘is official misconduct,’ ” and must be interpreted in accordance with that purpose. Commonwealth v. Brandwein, 435 Mass. 623, 631 (2002), quoting Coolidge v. New Hampshire, 403 U.S. 443, 488 (1971). The police certainly expect to surprise a defendant when they illegally enter his home and arrest him, and recognize that “some of the most incriminatory evidence is commonly obtained” from a defendant when he is caught off-guard and arrested. See Commonwealth v. Marquez, 434 Mass, at 378. Therefore, suppression of statements made by the defendant immediately after an illegal arrest serves to deter the police from illegally entering a home without an arrest warrant to make an arrest. It is far less foreseeable that a witness will be with the defendant when he is illegally arrested and that the arrest will cause the witness to provide incriminating evidence against the defendant. Therefore, the risk is minimal that the police will illegally enter someone’s home to make an arrest in the hope that a witness will be present who will provide information she would otherwise withhold. Nor is there any evidence here to suggest that the police had this purpose in mind when they entered 61 Lynde Street to arrest the defendant. Since suppression here would not serve to deter future constitutional violations or to punish police misconduct that was designed to accomplish an illegal purpose, the need to suppress evidence arising from an illegal entry does not, here, overcome the generalized need for the truth.
Therefore, the defendant’s motion to suppress the statement of Kristen Murphy must be DENIED.
3. The Motion to Suppress the Firearm
Even if the arrest warrant were valid, that arrest warrant would simply have authorized police entry into 61 Lynde Street to arrest the defendant. Without an accompanying search warrant, it would not have authorized a generalized search of the premises for firearms. The police, however, when they learned from Kristen Murphy about the presence of a firearm in a trash bag located on the driveway, near the steps leading to the side door, did not secure the trash bags and apply for a search warrant. Instead, they conducted a warrantless search of the two trash bags in that area, finding the firearm in one of them. This Court has considered three arguments that seek to justify that warrantless search: search incident to arrest, protective sweep, and exigent circumstances.3
a. Search Incident to Arrest
Under G.L.c. 276, §1,which is more restrictive than the Fourth Amendment and art. 14, a search incident to arrest may be made only to remove any weapons that the arrestee might use to resist arrest or effect his escape and to seize evidence of the crime for which the arrest was made in order to prevent its destruction or concealment. See G.L.c. 276, §1; Commonwealth v. Blevines, 438 Mass. 604, 607-08 (2003). Since the purpose of a search incident to arrest is to ensure the safety of the police and prevent the concealment or destruction of evidence, its permissible scope is limited to the defendant’s physical person and the area under his immediate control, as measured by the “wingspan” test. See Chimel v. California, 395 U.S. 752, 763 (1969); Commonwealth v. Brillante, 399 Mass. 152, 155-56 (1987). “The wingspan is the area of immediate physical control of the arrestee or the area that may fairly be deemed an extension of the person.” Chimel, 395 U.S. at 763. Here, the garbage bags that were searched were well outside even a generous interpretation of the defendant’s wingspan, since they were located on the driveway near the side steps, and were not searched until after the defendant had been arrested and placed in a police cruiser. Therefore, the search of the garbage bags cannot be justified as a search incident to arrest.
b. Protective Sweep
When the police enter a home to make an arrest or conduct a search, the police are permitted to conduct a protective sweep of the premises in order to protect the safety of police officers and others. Maryland v. Buie, 494 U.S. 325, 327 (1990). Before conducting a protective sweep of the premises, however, the searching officers must “possess! ] a reasonable belief based *503on ‘specific and articulable facts, which, taken together with the rational inferences from those facts, reasonably! ] warrant’ the officers in believing, that the area harbored an individual posing a danger to the officer[s] or others.” Id., quoting Michigan v. Long, 463 U.S. 1032 (1990). A protective sweep will be considered improper where there are no articulable facts to support an inference that anyone is in the arrest area or poses a danger. Commonwealth v. Nova, 50 Mass.App.Ct. 633, 635-36 (2000). Here, there is no evidence that the police officers who arrested the defendant believed that there was another person on the premises who posed a danger to them or to others if they were to obtain the discarded firearm described by Kristen Murphy. Thus, the officers were not justified in performing a protective sweep of the premises. See Nova, 50 Mass.App.Ct. at 635-36.
c. Exigent Circumstances
‘To support a warrantless search on the basis of exigent circumstances, the Commonwealth must demonstrate that the police had probable cause and were faced with exigent circumstances such as danger to their lives, danger to the lives of others, or the destruction of evidence, such that it would be impracticable to obtain a warrant.” Commonwealth v. Moore, 54 Mass.App.Ct. 334, 337-38 (2002). Here, there was plainly probable cause to search the garbage bags once Kristen Murphy told the police that the defendant had thrown the firearm out and that it was in a garbage bag left outside the house. The question is whether there were exigent circumstances that permitted the search of the garbage bags to be done immediately, without first obtaining a search warrant. The determination of exigency must be determined as of the time of the search, based on the totality of the circumstances. Commonwealth v. Forde, 367 Mass, at 801 (“the claim of exigency cannot be evaluated without considering the circumstances in their totality”). “[Wjhether an exigency existed, and whether the response of the police was reasonable and therefore lawful, are matters to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis.” Commonwealth v. Young, 382, Mass. 448, 456 (1981).
To be sure, the police could have sought consent to search the garbage bags from Paul Murphy or his father and, in the unlikely event that consent was denied, sent an officer to obtain a warrant authorizing the search of those garbage bags.4 Yet, there were four risks from the inherent and unpredictable delay in obtaining a search warrant. First, there were two children in the Murphy home, ages 4 and 6. If they while playing had somehow opened up the garbage bags and found the gun, there was the risk of a tragic accident.5 See New York v. Quarles, 467 U.S. 649 (1984) (providing a public safety exception to the requirement that a defendant be given Miranda warnings to permit the police to question the defendant about the location of a firearm left in a public area); Commonwealth v. Alan A., a Juvenile, 47 Mass.App.Ct. 271 (1999) (allowing the police, without Miranda warnings, to question a juvenile about the location of a firearm within a home, because “the presence of a loaded gun in or about a private residence also may present a substantial threat to a number of persons”). Second, there was the risk that the garbage bags would be picked up by trash collectors. This not only posed the risk that the firearm would be lost but also posed a safety risk to the trash collectors handling this garbage bag. Third, there was the risk that Kristen Murphy, who after all was the defendant’s girlfriend and only reluctantly told the police about the firearm, would dispose of the garbage bag herself to prevent the firearm from coming into evidence against her boyfriend . Fourth, there was the risk that Kristen Murphy was lying about the location of the firearm and would hide or dispose of it while the police waited for the search warrant. If she had been lying, a prompt search of the garbage bags would quickly have disclosed that lie, and permitted the police promptly to confront her as to its actual location. While the first three risks could be addressed by securing the garbage bags while the police waited for the search warrant, securing the bags would not prevent this fourth risk.
The determination of whether exigent circumstances excuse the absence of a search warrant involves essentially balancing:
the practicability of obtaining a search warrant;
the risks arising from the anticipated delay in obtaining the warrant;
the strong preference in the law for judicial authorization of searches; and
the magnitude of the privacy interest invaded by the search.
See generally Grasso & McEvoy, Suppression Matters Under Massachusetts Law (1999) at §14.1(c). As the United States Supreme Court declared in Texas v. Brown, “Our cases hold that procedure by way of a warrant is preferred, although in a wide range of diverse situations we have recognized flexible, common-sense exceptions to this requirement.” 460 U.S. 730, 741-44 (1983), quoted in Commonwealth v. Skea, 18 Mass.App.Ct. 685, 692-93 (1984). Here, the police could have obtained a search warrant and the risks posed by the expected delay in obtaining the warrant were significant but not nearly as compelling as in other cases. Compare with Commonwealth v. Garner, 59 Mass.App.Ct. 350, 365-66 (2003) (armed suspect in nightclub shooting had taken refuge in occupied dwelling). Yet, the privacy interest at stake — in garbage bags placed on the driveway near the front steps — is as minimal as the law recognizes. The Appeals Court has declared “generally, if not categorically, that a limited search of a man’s person is a lesser invasion *504of his privacy than a search of his home and papers.” Commonwealth v. Skea, 18 Mass.App.Ct. at 696. This Court can state generally, if not categorically, that a search of a garbage bag left outside one’s home is a far lesser invasion of privacy than a limited search of a man’s person. While the parties have essentially stipulated that there was a reasonable expectation of privacy in the garbage bags because they had not yet been placed at curbside for pick-up, see Commonwealth v. Pratt, 407 Mass. 647, 659-61 (1990), the fact remains that these bags were placed outside the house and appeared to the world to be ready for disposal on garbage day. This Court finds that, considering the minimal, albeit reasonable, expectation of privacy in the trash bags left near the porch, the exigent circumstances present here are sufficient to justify the failure to obtain a warrant. Therefore, the defendant’s motion to suppress the dismantled firearm found in one of those garbage bags is DENIED.
4. The Motion to Suppress the Defendant’s Statements Made at the Police Station
There is no dispute that the statements the defendant made at the police station — "I don’t have no gun. If I did, there would have been a shootout"— were not immediately preceded by any Miranda warning.6 Such a warning, however, is required only when the defendant is in custody and is being questioned by the police. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). If a defendant makes a statement that does not result from express questioning or its functional equivalent, then the absence of Miranda warnings does not require its suppression. Id.; Commonwealth v. Torres, 424 Mass. 792, 796-97 (1997). “The term ’’functional equivalent" includes “any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.” Commonwealth v. Torres, 424 Mass, at 797, quoting Rhode Island v. Innis, 446 U.S. at 301. “The ‘functional equivalence’ test does not turn on the subjective intent of the particular police officer but on an objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances.” Commonwealth v. Torres, 424 Mass, at 797, quoting United States v. Taylor, 985 F.2d 3, 7 (1st Cir.), cert. denied, 508 U.S. 944 (1993). This Court finds that the defendant’s statement was not triggered by the functional equivalent of questioning.
When Detective Cameron entered the booking room, he came to speak with the booking officer, not the defendant. It was only when the defendant loudly protested that he was being treated unfairly and had not done anything that Detective Cameron told the defendant that they had found the gun. A reasonable person in the defendant’s position would have understood this statement as it was intended — an attempt by the detective to silence the defendant’s claims of unfairness by informing him of physical evidence that strongly incriminates him in the armed robbeiy. A reasonable person in the defendant’s position would not have seen Detective Cameron’s statement as a form of interrogation or as an invitation to elicit an incriminating response. In short, a reasonable person would have understood that Detective Cameron was tiying to shut the defendant up, not start him talking about the armed robbeiy or the firearm. Therefore, the defendant’s motion to suppress this statement is DENIED.
ORDER
For the reasons stated above, the defendant’s motion to suppress is DENIED.

In reaching this conclusion, this Court has also considered an argument not made by the Commonwealth — whether the entry was justified by the existence of two active default warrants against the defendant for traffic offenses, both of which were known to the police at the time of entry. Even if the police would have been justified in entering the defendant’s residence to arrest him on these warrants, Mass.R.Crim.P. 6(c)(3) required the police, since they did not have either warrant in their possession, to inform him upon his arrest that he was being arrested on these default warrants. Instead, the police informed the defendant that he was being arrested for armed robbeiy, and did not make mention of the default warrants, since these were not the reason for his arrest. By failing to inform the defendant that he was being arrested on these default warrants, the Commonwealth lost the ability to use these warrants to justify the entry into 61 Lynde Street.

For this reason, to the extent that the defendant seeks to suppress the police officers’ observation in Kristen Murphy’s bedroom of burnt pieces that appeared to be from smoking crack cocaine, marijuana seeds, and pipes that could be used to smoke crack cocaine (and any of this evidence that was seized by the police), that motion must also be denied.

Nile Commonwealth has stipulated that the garbage bags were within the curtilage of the house and enjoyed an expectation of privacy.

It is worthy of note that, while other police officers were questioning Kristen Murphy, Sgt. Campbell went downstairs to speak with her father. He told Mr. Murphy that he thought there may be a gun in the house and asked for consent to search the bedroom where the defendant was arrested to look for the gun. Mr. Muiphy granted the consent. When Sgt. Campbell returned to the room to search it, he learned from other officers that Kristen Murphy had just told them that the gun was in one of the garbage bags outside. Sgt. Campbell neglected to speak again with Mr. Murphy to ask him to consent to a search of the garbage bags.

Kristen Murphy told the officers that the defendant had thrown the gun out; she did not tell them that the firearm had been dismantled by the defendant before he threw it out. Therefore, when the police looked for the gun, they reasonably expected to find an operable firearm.

The defendant, however, was advised of his Miranda rights immediately after his arrest at the Murphy home.